Bartolome E. ABUAN, et al., Plaintiff–Appellant,

v.

GENERAL ELECTRIC CO.; Monsanto Company, Defendants–Appellees.

Bartolome E. ABUAN, et al., Plaintiff–Appellee,

v.

GENERAL ELECTRIC CO., Defendant,

and

Monsanto Company, Defendant–Appellant.

Nos. 92–15476, 92–15662.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 1993.

Decided Aug. 26, 1993.

---

Alan C. Milstein, Leon H. Rose, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, NJ, for appellants-cross-appellees.

Steven R. Kuney, Mark A. Grannis, Williams & Connolly, Washington, DC, and John E. Moore, Thomas L. Roberts, Moore, Ching, Boertzel & Lawlor, Agana, Guam, for appellee General Elec. Co.

Charles F. Preuss, Vernon I. Zvoleff, Preuss, Walker & Shanagher, Jose H. Garcia, Bronson, Bronson & McKinnon, San Francisco, CA, and J. Bradley Klemm, Klemm, Blair, Sterling & Johnson, Agana, Guam, for appellee-cross-appellant Monsanto Co.

Before: WALLACE, Chief Judge, and D.W. NELSON and O'SCANNLAIN, Circuit Judges.

D.W. NELSON, Circuit Judge:

In May of 1987, an electrical transformer ruptured at the Piti Power Plant on the United States Naval Base in Guam, releasing a variety of toxic chemicals. Appellant Bartolome Abuan and a similarly situated class of plaintiffs ("Plaintiffs") sued General Electric Company ("GE") and Monsanto Company ("Monsanto") for injuries arising from the accident. The district court granted defendants' motions for summary judgment. Plaintiffs appeal from the grant of summary judgment, and Monsanto cross-appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Until the late 1970's, Monsanto manufactured chemicals known as polychlorinated biphenyls ("PCBs"). GE purchased PCBs from Monsanto in order to produce Pyranol, a fire-resistant dielectric fluid, which GE then used as insulation in electrical transformers and other devices. In 1949, GE sold one of its transformers to the Navy and delivered it to Guam, where it was used at the Piti Power Plant. The junction box on the transformer ruptured on May 26, 1987, releasing its contents and allegedly exposing Plaintiffs to PCBs and other toxic chemicals. The Navy immediately instituted a cleanup program using local workers. Following the incident, the Navy established a medical surveillance program for workers who might have been exposed to the spill.[1] Plaintiffs include workers who were allegedly exposed to the chemicals during the accident or the cleanup.

The Guam legislature subsequently authorized funding for suits by the workers against the United States, GE, and Monsanto. PCB Recovery Fund Act of 1989, Pub.L. No. 20–32, 9 Guam Sess.Laws 166. The legislature also enacted the Toxic Substances Exposure Compensation Act ("TSECA"), 10 Guam Code.Ann. § 41101–07, to facilitate recovery for individuals injured by exposure to toxic substances. Plaintiffs brought suit against GE and Monsanto, alleging that they had been exposed to PCBs, dioxins, and furans as a result of the accident and requesting relief on grounds of negligence and outrageous conduct, strict products liability, breach of warranty, civil conspiracy, and violations of TSECA.[2]

A class was certified on October 16, 1989. Monsanto's motion to dismiss for lack of personal jurisdiction was denied on April 20, 1990, *Abuan v. General Elec. Co.,* 735 F.Supp. 1479 (D.Guam 1990), and we denied Monsanto's petition for an interlocutory appeal. The district court entered a Scheduling Order on October 1, 1990, which provided:

> 4. By January 31, 1991, each claimant shall file and serve on defendants all medical and scientific opinions of experts, based on a reasonable degree of medical or scientific certainty and expressed in report form, supporting each claimant's claim that he or she was exposed to a sufficient level of PCBs, PCDFs and/or dioxins as a result of the Piti Power Plant incident to require future medical monitoring of said claimant and that such exposure placed claimant at increased risk of future injury, illness or disease.

Several claimants were subsequently dismissed for failing to be deposed or to answer interrogatories.

Defendants brought three separate summary judgment motions against the remaining class members. The district court granted the first two motions, finding that Plaintiffs had failed to demonstrate: (1) sufficient evidence of exposure which placed them at an increased risk of future illness, injury, or disease; and (2) present physical injury, which was an essential element of Plaintiffs' common law claims.[3] Plaintiffs timely appealed, and Monsanto timely cross-appealed.

## ANALYSIS

We review a district court's grant of summary judgment *de novo. F.D.I.C. v. O'Melveny & Meyers,* 969 F.2d 744, 747 (9th Cir.

---

1. A subsequent report concluded that the cleanup crew entered the area before officials had determined whether dioxin and furans had been released, without the recommended protective gear, and in some cases without proper training. General Accounting Office, *Toxic Substances: PCB Spill at the Guam Naval Power Generating Plant* 2–4 (1988) ("GAO Report").

2. Plaintiffs brought a separate class action against the United States and individually named defendants. *See Figueroa v. United States,* Nos.

92–15914, 92–16602 (9th Cir., argued July 15, 1993).

3. The third motion, which alleged that TSECA was unconstitutional, was not addressed by the district court and is not part of this appeal. Because we affirm the grant of summary judgment on the issue of exposure, we need not address the propriety of the district court's alternative holding that summary judgment was proper because Plaintiffs had failed to introduce evidence of physical injury.

1992). "The evidence must be viewed in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact for trial, and whether the district court correctly applied the relevant substantive law." *Id.* Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The analysis in this case is complicated by the fact that there are no reported Guam cases on point. However, where "there is a substantial body of legal authority under which affirmance is indicated, and in the absence of any indication that the local courts would reject that authority," we may affirm. *Chase Manhattan Bank, N.A. v. Gems–By–Gordon, Inc.,* 649 F.2d 710, 713 (9th Cir.1981). For this reason, we will look to the current trends in toxic tort jurisprudence to guide our analysis.

The district court found that Plaintiffs had failed to comply with the requirements of paragraph four of the Scheduling Order in that they had not introduced expert opinions, based on a reasonable degree of medical or scientific certainty, that they had been exposed to a *sufficient level* of toxic substances to succeed on their claims. The district court found that Plaintiffs' expert reports failed to comply with relevant legal standards and "admittedly ma[de] no attempt to indicate that any individual plaintiff was exposed to a sufficient level of toxins to justify future medical monitoring or conclude that a plaintiff faced an increased likelihood of future injury, illness, or disease due to exposure." In short, the district court found that Plaintiffs failed to introduce expert evidence sufficient to demonstrate the requisite proximate cause. After reviewing the reports, we agree.

## I. *Expert Opinions*

Before we turn to the sufficiency of the evidence regarding exposure, a brief summary of the expert reports is required. Plaintiffs rely heavily on the reports of Dr.

Robert J. Rutman, a professor of biochemistry and molecular biology, and Dr. Ronald Brecher, a toxicologist. Additional information regarding exposure was contained in the GAO Report.

Dr. Rutman submitted a cursory two-page preliminary report stating that in his opinion the Plaintiffs had been exposed to PCBs, PCDFs, PCDDs and/or CBs as a result of the accident, had an increased risk of future injury or illness, and required medical monitoring to detect possible adverse effects. Dr. Rutman's final report explained the potential toxic effects of exposure to the chemicals contained in transformer oils. He described in general terms the conditions of exposure at the Plant, but did not address the relative exposures of the different members of the plaintiff class.

> All cases of exposure to these carcinogenic chemicals inexorably lead to physical injury taking the form of present cellular damage to the genetic material (DNA). In my opinion, the available data show, to a reasonable degree of scientific certainty, that the Plaintiffs have sustained such physical injury to their cells. It is also my opinion that the exposures sustained by Plaintiffs and responsible for this physical damage have significantly increased their risk of cancer, birth defects and other toxic effects, such [as] hepatic dysfunction and abnormal immune system function.

> An appropriate regimen of regular medical surveillance based on a scientifically designed schedule of examination and testing would seem to be fully justified. . . .

In his deposition, Dr. Rutman testified that he was "interested in producing … [a] ballpark statement of whether these people had seen a negligible amount of chemical contamination or something which was substantial and therefore had to be considered. I would not even begin to say that that told me what the actual exposure was." He also opined that "we would reduce the cancer rate by something close to 50 percent if there were adequate *monitoring of the entire population* for early cancer …" (emphasis added).

Dr. Brecher's report described the results of various samples taken at the Plant after

the accident, as well as the possible toxic effects of such exposure. Dr. Brecher stated:

> [I]t is probable that anyone involved in the cleanup operation, or other related duties in the Piti Power Plant, from the time of the incident until December 28, 1987 or later was exposed to any chemicals present in the transformer oil. This exposure would have occurred both through inhalation and through the skin.

Dr. Brecher's report broke the plaintiff class into several categories. Each section reiterated how the individual plaintiffs *claimed to have been exposed* to chemicals from the transformer, and almost every section concluded:

> Based on the foregoing, my review of the plaintiffs' answers to interrogatories, questionnaires, personal statements and other documents I have reviewed on this case, it is my opinion, within a reasonable degree of scientific certainty that these plaintiffs were exposed to PCBs, PCDFs, PCDDs and/or CBs as a result of the Piti Power Plant incident on May 26, 1987, and that such exposures place these plaintiffs at an increased risk of future injury, illness or disease. It is my opinion that a regular and ongoing medical monitoring program is required for these plaintiffs in order to enable early detection and treatment of any adverse effects arising from these plaintiffs' exposures.

Dr. Brecher's categories ranged from members of the cleanup crew who had also been present in the Plant during the explosion to a woman who entered the Plant on the day of the explosion for ten to twenty minutes to look for her father. He made no quantitative nor qualitative distinctions between the exposures suffered by the different groups.

During his deposition, Dr. Brecher stated that he "did not develop a method for quantifying workers' exposures," and made a qualitative rather than a quantitative decision about exposure. "Any person who has a PCB exposure is at increased risk. And my definition of 'increased risk,' is risk increased compared to someone who has not been exposed." He recommended that "anyone exposed to these materials in an involuntary release be subjected to a medical monitoring program." The district court noted that "Dr. Brecher believes that *any* exposure to a toxic substance, no matter how minute or fleeting, always places a person at increased risk and justifies medical monitoring. His personal belief is so all-encompassing and amorphous that it is of no utility in the context of this lawsuit."

The GAO Report concluded that "29 employees were directly exposed to the PCB-contaminated oil" at the time of the accident. GAO Report at 2. Due to their lack of proper training, "Navy employees at Piti Power Plant were contaminated with PCBs, and it is possible that they may also have been contaminated with dioxins and furans." *Id.* at 3.

One of Plaintiffs' other experts, Dr. Yoshito Masuda, reviewed blood samples taken from the members of the plaintiff class. However, Masuda drafted an article which concluded that the PCB patterns of the allegedly exposed workers were "not much different" from those of the control group.

## II. *Analysis*

"In cases claiming personal injury from exposure to toxic substances, it is essential that the plaintiff demonstrate that she was, in fact, *exposed to harmful levels* of such substances." *Maddy v. Vulcan Materials Co.,* 737 F.Supp. 1528, 1533 (D.Kan.1990) (emphasis added). However, "precise data on the exact degree of exposure to each chemical" is not required. *Harper v. Illinois Cent. Gulf R.R.,* 808 F.2d 1139, 1141 (5th Cir.1987). Plaintiffs contend that their experts and the GAO report established sufficient exposure to preclude summary judgment.[4] In response, Monsanto and GE argue that because Plaintiffs would be required

---

4. Plaintiffs also argue that exposure can be established through the testimony of individual class members alone. However, they concede that the expert reports are necessary "insofar as they set forth the conclusion that such exposure was at levels proximately causing harm and justifying medical monitoring." Some jurisdictions do require expert testimony to prove causation. *See, e.g., Cottle v. Superior Court,* 3 Cal.App.4th 1367, 5 Cal.Rptr.2d 882, 892 (Ct.App.1992).

to prove sufficient individual exposures at trial, their failure to provide any expert testimony on this element mandates the entry of summary judgment.

It is clear that at some point in the litigation Plaintiffs would be required to prove individual causation and damages. *See, e.g., Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir.1988) ("generalized proofs will not suffice to prove individual damages") (emphasis added). The expert reports established that the release of chemicals from the transformer had exposed Piti workers to PCBs. As Plaintiffs concede, however, the individual class members had varying degrees of exposure. The experts made no attempt to compare the exposure levels of these different workers, nor did they provide any estimates of the relative increase in risk or need for future monitoring. The experts simply concluded that the workers had been exposed and, as a group, were at risk for future injury and required medical monitoring. This testimony simply did not suffice to meet the requirements of each chosen cause of action.

### A. *Increased risk of future injury*

A plaintiff who seeks damages for increased risk of future illness or injury "can recover only where he can show that the toxic exposure more probably than not *will* lead to" the malady. *Hagerty v. L & L Marine Servs., Inc.*, 788 F.2d 315, 319 (5th Cir.), *modified on other grounds*, 797 F.2d 256 (5th Cir.1986). *See also Sterling*, 855 F.2d at 1204 ("[w]here the basis for awarding damages is the potential risk of susceptibility to future disease, the predicted future disease must be medically reasonably certain to follow"); *Mauro v. Raymark Indus., Inc.*, 561 A.2d 257, 264 (N.J.1989) ("plaintiff must prove that the prospective disease is at least reasonably probable to occur"). None of the expert reports contained such a conclusion, and Plaintiffs do not claim to have presented evidence on this element. Summary judgment was appropriate with respect to this issue.

### B. *Medical Monitoring*

Although this issue is more difficult, we are convinced that the district court's conclusion was correct. In order to recover for costs of medical monitoring, a plaintiff must prove that:

1. Plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant.

2. As a proximate result of exposure, plaintiff suffers a *significantly increased risk* of contracting a serious latent disease.

3. That increased risk makes periodic diagnostic medical examinations reasonably necessary.

4. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

*Brown v. Monsanto Co. (In re Paoli R.R. Yard PCB Litigation)*, 916 F.2d 829, 852 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991) (emphasis added). *See also Merry v. Westinghouse Elec. Corp.*, 684 F.Supp. 847, 852 (M.D.Pa. 1988) (requiring "a significantly but unquantifiably enhanced risk of serious disease"); *Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287, 312 (1987) (requiring "expert testimony predicated upon the significance and extent of exposure to chemicals ... [and] the relative increase in the chance of onset of disease"). Because the district court combined its discussion of medical monitoring with that of increased risk, it conducted no independent analysis of the exposure required to sustain a medical monitoring claim. The district court merely concluded that Plaintiffs had not presented competent expert evidence of exposure.

Both the Rutman and Brecher reports concluded *in general* that medical monitoring was required in order to detect early signs of PCB-induced illness in Plaintiffs. Dr. Rutman also stated that, in his opinion, "the exposures sustained by Plaintiffs ... have significantly increased their risk of cancer, birth defects and other toxic effects, such as hepatic dysfunction and abnormal immune system function." Neither expert, however, attempted to state how "significant" or relative the increased risk was for any individual,

either in the abstract or as compared to other members of the class. Thus, their evidence failed to meet the *Paoli* significance standard.

Moreover, the deposition testimony of the experts undercut the force of their reports. As the district court noted, Dr. Brecher stated that *"any* exposure to a toxic substance, no matter how minute or fleeting ... justifies medical monitoring." Similarly, Dr. Rutman stated that "medical monitoring is justified at any level of risk," and opined that medical monitoring of the population at large would be "a good idea." Given the "amorphous" views of the experts and the dearth of conclusions regarding the quantitative (or even qualitative) increased risk to individuals, Plaintiffs failed to create a genuine factual issue on exposure and summary judgment was appropriate.

## C. *TSECA*

■ The district court concluded that "plaintiffs have not only failed to show individual exposure, they have failed to show sufficient exposure, whether to individuals or the group of plaintiffs as a whole, even under Guam's extremely plaintiff-friendly [TSECA]." TSECA allows "[a]ny person who has been exposed to toxic substances at a level above federally permitted levels of exposure" to bring an action for damages. 10 Guam Code Ann. § 41104.

> Federally permitted levels of exposure shall mean the maximum levels of exposure of humans as determined by federally [sic] regulatory agencies, including but not limited to [the EPA, OSHA, and NIOSH]. In the case of conflicting maximum permissible exposure levels, the lowest maximum permissible exposure level shall apply. *For exposure in the work place, the eight-hour work place exposure level shall be considered the "federally permitted level of exposure."* If no eight-hour work place exposure level exists, the lowest applicable maximum permissible exposure level shall apply.

10 Guam Code Ann. § 41103(3) (emphasis added). The district court found that no Plant sample revealed a PCB level higher than the sole "eight-hour work place expo-

sure level," *i.e.,* OSHA's standard (.5 mg/m³). *See* 29 C.F.R. § 1910.1000(a)(2) (Table Z–1–A) (1992).

On appeal, Plaintiffs argue that the district court misread § 41103(3). They argue that the Act considers the "federally permitted level" to be "the lowest maximum permissible" level, regardless of whether or not another agency has set an eight-hour work place level. Plaintiffs then rely on Dr. Rutman's statement that Plaintiffs "necessarily inhaled contaminated air containing in excess of NIOSH limits of 1 ug/m³ of PCBs" to support their TSECA claim. However, a plain reading of § 41103(3) demonstrates that the "lowest applicable maximum permissible exposure level" applies *only when there is no eight-hour work place exposure level.* The parties agree that only OSHA has set an eight-hour work place exposure level. Because Plaintiffs have offered no evidence that their exposures exceeded the OSHA limit, summary judgment was proper on the TSECA claim.

## CONCLUSION

We affirm the district court's grant of summary judgment on the grounds that Plaintiffs failed to introduce sufficient evidence of exposure to demonstrate the requisite proximate cause. Because we conclude that summary judgment was proper, we need not decide whether the denial of Monsanto's motion to dismiss for lack of personal jurisdiction was in error.

**AFFIRMED.**