REDLAND SOCCER CLUB, INC., Dean G. Newhouse, Richard V. Spong, Sr., Robert E. Kane, and Jack H. Hershberger, et al., Plaintiffs,

v.

DEPARTMENT OF the ARMY OF the UNITED STATES of America, and the United States of America, Defendants.

Civ. A. No. 1:CV–90–1072.

United States District Court, M.D. Pennsylvania.

Oct. 19, 1993.

Marvin Beshore, Laurence W. Dague, Shumaker & Williams, Harrisburg, PA, Louis M. Tarasi, Jr., Tarasi & Johnson, P.C., Pittsburgh, PA, Glenn R. Davis, Raja G. Rajan, Shumaker Williams, P.C., Harrisburg, PA, for plaintiffs.

Richard B. Stewart, Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, Robert Lefevre, U.S. Dept. of Justice, Wendy L. Weiss, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, Kim D. Daniels, U.S. Attorney's Office, Harrisburg, PA, Margaret Jane Mahoney, U.S. Dept. of Justice, Brett P. Scott, Stuart M. Gerson, Wagner Jackson, William E. Michaels, Adam Bain, U.S. Dept. of Justice Torts Branch, Civ. Div., Washington, DC, for the U.S.

Marvin Beshore, Laurence W. Dague, Glenn R. Davis, Raja G. Rajan, Shumaker Williams, P.C., Harrisburg, PA, for Redland Soccer Club, Inc., Bretni Brink, Ryan Brink, Joseph Brtalik, Carole G. Brtalik, Joseph J. Brtalik, Theodore F. Burd, Diane M. Burd, Dewitt J. Cline, Jr., Jan M. Cline, Ronald W. Danner, Steven W. Haas, Irma L. Rodgers–Haas, Lawrence E. Hager, Ruth A. Hager, Edward Hockenberry, Mary L. Hockenberry, Roger L. Hockenberry, Patricia D. Hockenberry, David G. Hooper, Priscilla G. Hooper, John H. Knaub, Deborah J. Knaub, Thomas R. Krause, Richard H. Lebo, Donna Lebo, Ralph E. McCarty, Gale P. McCarty, James P. Meyers, Kim Meyers, Thomas M. Morrow, Meredith S. Morrow, Jack E. Muth, Kathleen L. Muth, John A. Nace, Jr., Linda M. Nace, Kenneth E. Nace, Pamela R. Nace, Dean G. Newhouse, Norma J. Newhouse, Martin Newhouse, Peter P. O'Neill, Alice L. O'Neill, Peter O'Neill, Patrick O'Neill, Paul O'Neill, Patricia·A. Palm, Robert J. Pontius, Cindy L. Pontius, Debra S. Popp, Thomas M. Rados, William P. Rehm, Jr., Kimberly A. Rehm, Ken Ribble, Susan Ribble, Nevin C. Shenck, Jr., Lisa L. Shenck, Bradley Shirk, Richard V. Spong, Sr., Julia A. Spong, Richard V. Spong, Jr., Barry L. Stone, Corey J. Stroman, Donna L. Szoszorek, Eugene K. Torbek, Donald Williamson, Elizabeth M. Williamson, William B. Wirt, Pamela A. Wirt, Christine E. Wirt, Burlin Covert, Joseph Dorwart, III, Patricia A. Dorwart, Jack H. Hershberger, Jr., June Hershberger, Larry Smart, Carol Smart, Glenn Diller, Dale Kahler, Robert E. Kane, Terrence L. Kemberling, David A. Kupp, E. Robert McCollum, Herbert D. Myers, Wilbur Yorty.

Richard W. Sponseller, U.S. Attorney's Office, Harrisburg, PA, Leslie Yu, Torts Branch, Civ. Div., Margaret Jane Mahoney, J. Patrick Glynn, Wagner Jackson, Adam Bain, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for Dept. of Army of the U.S.

Richard W. Sponseller, U.S. Attorney's Office, Harrisburg, PA, Robert Lefevre, Leslie Yu, Wendy L. Weiss, Torts Branch, Civ. Div., Brett P. Scott, U.S. Dept. of Justice, Washington, DC, Kim D. Daniels, U.S. Attorney's Office, Harrisburg, PA, Margaret Jane Mahoney, Stuart M. Gerson, U.S. Dept. of Justice, Civ. Div., J. Patrick Glynn, Wagner Jackson, Adam Bain, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for the U.S.

*MEMORANDUM*

CALDWELL, District Judge.

We are considering Defendant's motions to dismiss and for summary judgment and Plaintiffs' motions for partial summary judgment and to strike. We properly exercise jurisdiction over this environmental-law claim according to 28 U.S.C. § 1331.

I. *Facts and Procedural History*

As our previous memoranda have described the facts in some detail, our recitation here of the history of the case will be brief.

The New Cumberland Army Depot ("NCAD," now known as Defense Distribution Region East) is a large supply facility operated by the United States Army in Fairview Township, Pennsylvania. For about 40 years, beginning in 1917, NCAD disposed of various forms of waste in a 14–acre landfill known as the Marsh Run Field. In 1972, the Army determined that it no longer needed much of the land surrounding NCAD and, in 1976, the government transferred Marsh Run Field to Fairview Township by quitclaim deed. Plaintiffs indicate that the field was used for soccer play between 1983 and 1987.

Plaintiffs in *Redland Soccer Club v. Department of the Army* are members of a soccer club that used the field, township employees who worked at the field, and neighbors. Plaintiffs in *Elliott v. United States* are neighbors of the park who allege that their children were exposed to toxins while playing in what is now called Marsh Run Park.[1]

## II. *Law and Discussion*

### A. *Defendant's Motion to Dismiss*

The Army argues that it is immune from Plaintiffs' tort claims.

#### 1. *The Federal Tort Claims Act and the Discretionary Function Exception*

In 1946, Congress enacted the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), which was to serve as a limited waiver of sovereign immunity.

> The FTCA ... waives sovereign immunity in suits against the United States for injuries or losses caused by the negligent or wrongful acts or omissions of any employee of the government under circumstances where a private person would be liable to the claimant.

*Sea–Land Service, Inc. v. United States,* 919 F.2d 888, 890 (3d Cir.1990). The FTCA contains a number of exceptions, including the one at issue here: the discretionary function exception. It exempts from the purview of the FTCA any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Thus, if a governmental action falls within the discretionary function exception, the waiver of sovereign immunity has no effect and the government remains immune from suit.

 The United States Supreme Court has examined the discretionary function exception on several occasions in the 47 years since the FTCA was enacted. The Court's most recent pronouncement was in *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). There, the Court re-stated the two-part test it established in *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). A district court considering application of the discretionary function exception is to question (1) whether the act is actually discretionary; *i.e.,* does the government actor have decisions to make or is his conduct prescribed by statute or regulation? and (2) whether the action implicates legislative or administrative decisions grounded in social, economic, and political policy. *Berkovitz, supra,* at 537, 108 S.Ct. at 1959. In delineating those decisions implicating social, economic or political policy, courts have indicated that the exception is intended to "prevent judicial 'second-guessing' of legislative and administrative decisions ... through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Importantly, the exception does not immunize every discretionary act by a government employee or agency; a court must decide "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz, supra,* 486 U.S. at 536, 108 S.Ct. at 1959.

We read *Gaubert, Berkovitz, Varig Airlines,* and the lower-court cases applying them, to draw an important distinction between those acts of government actors that

---

1. For purposes of this Memorandum, we do not address a separate class of plaintiffs, those in

*O'Neal v. Department of the Army.*

embody public policy and those that are merely every-day decisions devoid of any public policy implications. To implicate public policy, a decision must be "susceptible to policy analysis." *Autery v. United States,* 992 F.2d 1523, 1531 (11th Cir.1993).

Many actions of government agencies and employees clearly implicate policy decisions. For example, in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Court considered a case involving a massive explosion in fertilizer being prepared for shipment to Europe as part of a comprehensive program to increase the food supply in occupied countries at the conclusion of World War II. *Id.* The Court determined that the discretionary function exception applied because the fertilizer was gathered and prepared as part of an overall federal policy. *Id.* at 37–38, 73 S.Ct. at 969.

*Varig Airlines* involved a tort challenge to regulations regarding the Federal Aviation Administration's program for "spot-checking" airplanes for safety problems. 467 U.S. at 815, 104 S.Ct. at 2765. The Court determined that the regulations and the decisions of the FAA in implementing them reflected public policy considerations concerning airline safety and, thus, were within the exception. *Id.*

In *Berkovitz,* the Court determined that a government program regulating laboratories producing polio vaccine reflected public policy concerns, although the Court remanded the case for consideration of whether the decision at issue was, in fact, discretionary. 486 U.S. at 533, 108 S.Ct. at 1957.

Finally, in *Gaubert,* the Supreme Court reviewed the dismissal of a case alleging negligent supervision of an insolvent savings and loan association by federal regulators. 499 U.S. 315, 111 S.Ct. 1267. The Court determined that the actions of the government in regulating the savings and loan and in managing its affairs were actions in furtherance of public policy. *Id.*

These cases share a common theme: in each, the government agency acted in some way to fulfill the mandate of Congress; each case involved either government regulation of private conduct or government conduct of foreign affairs as delegated to the agency. Public policy, however, is not implicated by everything the government does. As Justice Byron White wrote in *Gaubert:*

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

499 U.S. at 325 n. 7, 111 S.Ct. at 1275 n. 7, 113 L.Ed.2d at 348 n. 7. Finally, the United States Court of Appeals for the First Circuit has recently explained that:

> "[i]f the injury-producing conduct was an integral part of government policymaking or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the case could not be decided without usurping the power and responsibility of either the legislative or executive branch of government, governmental immunity would probably attach."

*Horta v. Sullivan,* 4 F.3d 2, 19 (1st Cir.1993) *quoting Harry Stoller and Company, Inc. v. Lowell,* 412 Mass. 139, 587 N.E.2d 780, 783 (Mass.1992).

In summary, we draw the distinction implicit in the caselaw between decisions by the government that implicate public policy and those that are merely the sorts of decisions made every day by individuals and corporations to manage their affairs.[2] An example is

---

2. For a review of some of the reasons underlying the discretionary function exception, see Barry R. Goldman, Note, *Can The King Do No Wrong? A New Look At The Discretionary Function Exception To The Federal Tort Claims Act,* 26 Ga.L.Rev.

837 (1992). Among the rationales for the exception are (1) the separation of powers doctrine, (2) encouragement of vigorous government enforcement efforts, and (3) the avoidance of huge fiscal liability. *Id.* at 852–56.

illustrative: the Federal Emergency Management Agency ("FEMA") is an agency charged with coordinating federal response to various crises. If FEMA managers decide not to send federal funds to Iowa after a major flood, the decision would presumably be one protected by the discretionary functions exception. The decision would be reached as part of FEMA's congressionally delegated powers and would necessarily implicate public policy considerations. On the other hand, if FEMA managers elect to require agency employees to recycle paper in FEMA offices, the decision is certainly discretionary but it does not involve public policy and is not the type Congress intended to shield.

### 2. The Application of the Discretionary Function Exception to The Case at Bar

■■■ The question of the applicability of the FTCA and its exceptions to an action is, in effect, an issue of subject-matter jurisdiction. *Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d 884 (3d Cir.1977). As such, in considering whether an action falls within an exception to the FTCA, we do not consider the merits of the case or the factual record beyond its description of the nature of the governmental action. *Id.* Further, the FTCA, as a waiver of sovereign immunity, must be strictly construed in favor of the government. *Sea–Land Service, Inc., supra,* at 889.

In the instant case, the Army argues that the decisions regarding waste disposal and land transfer at Marsh Run Park meet the first prong of the *Berkovitz* test; namely, that the decisions were truly discretionary. Further, the Army asserts that the decisions must implicate policy concerns, thus satisfying the second prong of the *Berkovitz* test.

The decisions referred to—including selecting a method of waste disposal, classification of some waste material as salvageable, locating the landfill, and selecting methods of operating and maintaining the landfill—are the type of decisions dominated by considerations of affordability, efficiency and safety. Therefore, they are decisions grounded in policy, and are thus protected by the discretionary functions exception.

Defendant's Brief in Support of Motion to Dismiss at 30.

Plaintiffs dispute Defendant's analysis, focusing primarily on the first part of the *Berkovitz* test. Plaintiffs contend that various statutes and regulations made the various actions by the Army non-discretionary.

■■■ Plaintiffs address only in passing the second prong of the *Berkovitz* analysis, which we find dispositive of the issue. As we have noted, not every discretionary action undertaken by a government actor falls within the discretionary function exception. We examine the "nature of the conduct, rather than the status of the actor." *Varig Airlines, supra,* 467 U.S. at 813, 104 S.Ct. at 2764. The Army's actions with regard to Marsh Run Park were not the sorts of decisions contemplated by the discretionary functions exception.

■■■ Defendant contends that, because it had to determine how and where to dispose of waste and because these questions are governed by considerations of cost and safety, policy in the *Berkovitz* sense is necessarily implicated. We disagree. We construe *Berkovitz* and the cases preceding and following it to refer to a specific sort of policy— not merely policy regarding internal affairs of the agency but policy in more direct furtherance of the agency or department's congressionally delegated mission.[3]

---

3. While the case law in this area is regrettably sparse, we believe this interpretation of *Berkovitz* to be in accord with the holdings of that case and the others cited, *supra.* We are bolstered in this conclusion by reference to one of the major rationales for the discretionary function exception: separation of powers. The exception serves to protect the executive and legislative branches from judicial "second-guessing" while they are fulfilling their constitutional duties. *Varig Air-*

*lines,* 467 U.S. at 814, 104 S.Ct. at 2764. Indeed, in *Gaubert,* the Court wrote:

Where Congress has delegated the authority to an independent agency or to the executive branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the

Here, Army officials determined where to place a landfill, what to commit to the landfill, and whether to transfer the land to Fairview Township. These are largely internal decisions. While we have little doubt there was a process of deliberation involved, we are dubious that this sort of policy is of the kind "that the discretionary function exception was designed to shield." *Berkovitz, supra,* 486 U.S. at 536, 108 S.Ct. at 1958; *see also, Powers v. United States,* 996 F.2d 1121, 1126 (11th Cir.1993). Here, the Army, acting as would any large corporation, made certain decisions regarding disposal of waste. Only in the most tangential way could it be said that these decisions were in furtherance of the Army's mandate.[4]

While the case law interpreting what sorts of decisions reflect economic, social or political policy is enigmatic, we find a distinction between the facts of the instant case and those of *Dalehite, Varig Airlines, Berkovitz,* and *Gaubert.* Thus, we will deny Defendant's motion as it relates to the discretionary function exception of the FTCA.

### 3. *FTCA Claims of Public Nuisance and Trespass*

The Army initially moved for dismissal of Counts III and V of the *Redland* complaint on the ground that they were based on a theory of strict liability, which is not available under the FTCA. *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

Plaintiffs respond that

[i]n the instant action, Plaintiffs are not seeking to recover in trespass and nuisance under a strict liability theory; Defendants' numerous negligent acts are what give rise to the trespass and nuisance claims.

Plaintiffs' Brief in Opposition at 13. The Army answers that, to the extent the claims are based in negligence rather than strict

liability and so long as the claims are not otherwise barred, jurisdiction is not at issue. Defendant's Reply Brief at 13. Plaintiffs have cast their claims as sounding in negligence and, as such, we will not dismiss them.

### B. *Defendant's Motion for Summary Judgment on FTCA Claims*

Defendant seeks summary judgment in its favor on Plaintiffs' claims for medical monitoring and emotional distress.

Summary judgment is appropriate when there remain no genuine issues as to any material facts and judgment may be entered as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a movant submits that there is no genuine issue as to a material fact, its opponent must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd., et al v. Zenith Radio Corp., et al,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### 1. *Medical Monitoring*

The Third Circuit has concluded that, presented with the issue, the Pennsylvania Supreme Court would recognize a cause of action for medical monitoring. *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 851 (3d Cir.1990); *see also, Merry v. Westinghouse Electric Corp.,* 684 F.Supp. 847 (M.D.Pa.1988) (Caldwell, J.). The *Paoli* court set forth a four-part test to ascertain when medical monitoring would be appropriate. A plaintiff (or plaintiffs) must prove that:

1. The plaintiff was significantly exposed to a proven hazardous substance though the negligent actions of the defendant.

2. As a proximate result of exposure, the plaintiff suffers a significantly in-

---

agencies are to carry out the programs. In addition, the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected.

499 U.S. at 323, 111 S.Ct. at 1274, 113 L.Ed. at 346.

**4.** Indeed, if pressed far enough, a soldier's decision about how to drive an automobile could be said to be in furtherance of public policy. *See Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. at 1275 n. 7, 113 L.Ed.2d at 348 n. 7 (quoted, *supra* ).

creased risk of contracting a serious latent disease.

3. That the increased risk makes periodic diagnostic medical examinations reasonably necessary.

4. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

916 F.2d at 852. The policy reasons for recognizing this tort are legion. Society has reached a point in which potentially toxic chemicals and products are commonly used by government and industry. It is now not only possible but likely that many victims of negligent exposure to toxins will not see the health effects of that exposure for months or even years after their contaminations.[5]

■ Defendant's motion focuses initially on the first part of the *Paoli* test: proof of significant exposure. This is a crucial element. Upon review of *Paoli* and the relatively few cases from other circuits and districts, we determine that, to meet this requirement, Plaintiffs must offer clear evidence that they were exposed not only to the soil and water on the surface of the Marsh Run Park, but to the actual toxins they claim are there.

We find support for this determination in a number of cases. In *Paoli*, the plaintiffs offered expert testimony claiming, *inter alia*, that there were increased levels of certain toxins (polychlorinated biphenyls or PCBs) in the plaintiffs' blood. 916 F.2d at 842. Thus, there was enough evidence of actual exposure to preclude entry of summary judgment; a triable factual dispute regarding the amount of the exposure and the derivation remained.

In *Friends For All Children v. Lockheed Aircraft*, 746 F.2d 816 (D.C.Cir.1984), the D.C. Circuit examined an analogous case. A group of Vietnamese orphans was being flown from Saigon to the United States aboard a Lockheed jet when the aircraft suffered sudden decompression and loss of cabin pressure. *Id.* at 819. After a crash

landing, many of the children died, but the guardians of those who lived brought a lawsuit seeking, among other things, periodic diagnostic tests of the children to determine if the decompression and loss of oxygen had affected them. *Id.* The court approved medical monitoring and offered a hypothetical:

Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

*Id.* at 825. The court's analogy is equally applicable to a toxic tort case such as the one at bar. Jones was clearly exposed to a risk of harm when the motorbike knocked him down and his head struck the ground. Similarly, we believe that a toxic tort plaintiff must prove that he was *definitely* exposed to some agent that *may* later cause him harm. There is, of necessity, a degree of speculation in a medical monitoring case. However, we conclude that the allowable conjecture should be in regard to the amount or future effect of the exposure, not whether there was exposure at all.

In *Abuan v. General Electric Co.*, 3 F.3d 329 (9th Cir.1993), the plaintiffs alleged that they had been exposed to PCBs and sued the manufacturer of the PCBs and the electrical transformer they alleged exposed them to the toxins. The Ninth Circuit affirmed the district court's entry of summary judgment in part because the plaintiffs had failed to demonstrate that each individual had actually been exposed to PCBs. *Id.* at 331.

Thus, while there is a dearth of case law interpreting what sort of exposure a plaintiff must prove in a medical monitoring case, we hold that a plaintiff in such a case must prove

5. For more detailed descriptions of the advent of medical monitoring, see Amy B. Blumenberg, *Medical Monitoring Funds: The Periodic Payment of Future Medical Surveillance Expenses in Toxic*

*Exposure Litigation*, 43 Hastings L.J. 661 (1992); Allan Kanner, *Medical Monitoring: State and Federal Perspectives*, 2 Tul.Envtl.L.J. 1 (1989).

that he was actually exposed to a toxic agent—not merely that he might have been exposed.[6] Thus, to survive the current motion, Plaintiffs must offer sufficient evidence to raise a dispute about whether they were exposed to the toxins alleged to be buried in the Marsh Run Park.[7]

■ Defendant argues that Plaintiffs' expert merely speculates about whether any of the Plaintiffs actually were exposed to the toxins alleged to be buried at the Marsh Run Park. An examination of the expert's report supports this assertion.

> The soccer field which was established on the abandoned landfill, and the surrounding marsh and stream, offer many *potential* routes of exposure to the chemicals disposed in the landfill. The following *appear* to be *the most likely* pathways through which the children and adults using the soccer field *could* have been exposed to the chemicals of concern.

*Public Health Risk Assessment Of A Soccer Field Near The New Cumberland Army Depot* [hereafter, *"Plaintiff's Report"*] at 16 (emphasis added). The report explains that the levels of toxins found in the soil were measured largely in test pits; in other words, the results reflect levels not at the surface of the field but underneath. *Id.* at 7–15. The report contains conjecture about the amounts that would have been on the surface of the field at the time the various Plaintiffs had contact with it. *Id.* Further, the report speculates regarding various ways Plaintiffs might have had contact with the soil on the surface: (1) direct ingestion while playing on the field, (2) direct ingestion of water while playing on the field, (3) dermal contact with contaminated soil or water, or (4) inhalation of contaminated dust from the playing field.

> Children and teen-agers playing soccer and adults organizing, coaching, and refer-

eeing the games are all subject to ingesting soil and dust from the soccer field.

*Plaintiff's Report* at 16.

> Rain water on the soccer field will leach chemicals from the soil. Children and adults using the field during and after a rain *may* be exposed to chemicals in puddles on the field or to runoff water in the drainage ditches and marshy areas with standing water surrounding the field.

*Id.* at 17 (emphasis added).

> Toxic and hazardous chemicals in soils and mud on the hands and legs of children and adults *can* cross through the skin and reach the blood stream.

*Id.* at 18 (emphasis added).

> Calculations were also made of the amounts of volatile organic compounds which *might* volatize from the soil and be inhaled by the children and adults on the soccer field.

*Id.* at 19 (emphasis added).

Thus, Plaintiffs' expert never reports that anyone had actual contact with contaminants. The report speculates that, when the field was in use, the surface soil had contaminants and that the Plaintiffs were exposed to those contaminants through the means described above; there is here a sort of double speculation. What is noticeably absent is any evidence that any of the toxins listed in the report *actually* were at the surface of the field when Plaintiffs played there or that any of the toxins *actually* invaded the bodies of the Plaintiffs. There is no evidence of blood or tissue tests as were conducted in *Paoli.* 706 F.Supp. 358, 365 (E.D.Pa.1988) (district court opinion describing expert opinions based on blood tests). Thus, Plaintiffs would ask a factfinder to accept not only speculation that the toxins might later cause medical complications but speculation that Plaintiffs were actually exposed to the toxins at all.

In response to this argument, Plaintiffs assert that Defendant's criticism of Plaintiffs'

---

**6.** We distinguish this holding from our conclusion in *Merry* that plaintiffs seeking medical monitoring need not demonstrate present physical injury. 684 F.Supp. at 849.

**7.** If Plaintiffs' expert conclusively testifies that there was some exposure and Defendant's expert testifies otherwise, there would be a genuine issue as to a material fact so as to defeat summary judgment because a factfinder would have to weigh the experts' credibility.

expert merely shows that there is a factual dispute. We disagree. Even if we were to assume that Plaintiffs' expert is credible, we would have to find that he has not offered definitive testimony that Plaintiffs were actually exposed to any toxins.[8] Plaintiffs' expert, Dr. Richard Cronce, makes clear in his reports that he can not testify that there were contaminants in the soil *at the surface* of the field when Plaintiffs were present there.

> A number of assumptions concerning exposure and resulting health effects must be made in a risk assessment, with concomitant uncertainties.

*Comments on the Declaration of Roger Minear* at 3.

> REWAI does not in anyway suggest that the risk assessment can provide the "true risk", since the actual exposures of children and adults to the contaminants at the soccer field can not be determined. The actual amounts of soil, dust, and water contacted, ingested or inhaled were not measured at the time of play on the field and now can never be known. However, reasonable assumptions can be made to determine whether significant risks to human health exist …

*Comments on the Declaration of Martyn T. Smith* at 2. Indeed, Defendant's expert, Dr. Martyn Smith, offers similar testimony.

> Hence, we cannot know for certain if anyone playing soccer came into contact with any site-originated chemicals. We do not know for certain that any chemicals leached upwards into surface water or volatized into the air. Thus, all exposures are "hypothetical" and, in my opinion, plaintiffs experts have failed to document any actual chemical exposure.

---

8. It is helpful to again refer to the D.C. Circuit's analogy from *Friends For All Children* in which the man struck by a motorbike seeks medical care to assure that no non-apparent injury has befallen him. Jones, the man who was struck, knew with certainty that he had struck his head. The speculation that made his visit to the hospital reasonable was as to whether the blow to the head had caused an injury, not whether there had ever been a blow to the head.

*Second Declaration of Dr. Martyn T. Smith* at ¶ 9.

In addition to their expert's report, Plaintiffs offer anecdotal evidence of exposure:

> However, [Plaintiff] Richard V. Spong, Jr. has testified that soccer was played during rain. He recalls playing soccer when there were puddles on the field, some of which were an inch or two deep. He specifically recalls falling face first into puddles. Upon falling, the whole front of his body would get wet. He also recalls falling into the dirt "a lot" and actually getting soil in his mouth! Thus, those factual issues are very clearly in dispute and will have to be addressed at trial.

Plaintiffs' Brief in Opposition at 17 (citations omitted).

> The adjacent landowners have regularly waded in Marsh Run Creek, which was contaminated by hazardous substances. The adjacent landowner Plaintiffs used MRP for recreation purposes even before it was excavated into a soccer field. Plaintiffs even have drank water from Marsh Run Creek. One Plaintiff actually drank water from the Creek around the time major fish kills occurred as a result of illegal activities at NCAD.

> The Township workers also had to work in the Creek on occasion.

> \* \* \* \* \* \*

> During the excavation and landscaping the Township workers walked in the dirt and inhaled dust, and sat and ate their lunches on the field.

*Id.* at 17–18. Again, this evidence fails to demonstrate that any toxins were at the surface of the field or that any toxins were actually introduced into Plaintiffs' bodies.[9]

---

9. Plaintiffs' expert relied on soil sample results that were derived from "test pits," holes dug several feet into the ground, rather than the surface of the field itself. Defendant offers expert testimony that actual surface samples did not reveal traces of volatile organic compounds. *See Second Declaration of Roger Minear* at ¶ 4. Defendant's expert contends that, in reality, the chemicals found in the Marsh Run landfill would tend to migrate downward over time, thus making exposure at the surface less rather than more likely. *Id.*

Thus, to ultimately find in favor of Plaintiffs' medical monitoring claims, we would have to allow speculation that: (1) there were toxins at the surface of the field or close enough that persons on the field would come into contact with them, (2) the Plaintiffs ingested, inhaled or otherwise contacted soil, dust or water contaminated with those toxins, and (3) the toxins settled in any way into Plaintiffs' bodies.[10] We conclude that, as a matter of law, Plaintiffs have failed to demonstrate that there is a dispute as to a material fact—namely, whether they were actually exposed to toxic substances as would be required to make out a medical monitoring claim according to *Paoli.* We will grant Defendant's motion and enter judgment against Plaintiffs on the medical monitoring claim.

### 2. *Emotional Distress*

Defendant also seeks summary judgment on Plaintiffs' claim for emotional distress arising from their alleged exposure to the toxins at Marsh Run Park.

▆ It is clear that Pennsylvania law does not provide recovery for negligent infliction of emotional distress absent some physical injury or impact. *Wisniewski v. Johns–Manville Corp.,* 759 F.2d 271, 274 (3d Cir. 1985); *Bubash v. Philadelphia Elec. Co.,* 717 F.Supp. 297, 301–02 (M.D.Pa.1989) (Caldwell, J.).

▆ Defendant contends, and the record corroborates, that no Plaintiff in *Redland Soccer Club, Inc., et al. v. Dep't of the Army* has suffered a physical injury. Plaintiff responds that our opinion in *Merry,* 684 F.Supp. 847 (Caldwell, J.), serves as "law of the case" and, thus, that Defendant's motion is "shocking." [11] We disagree. In *Merry,* we held that a plaintiff seeking damages for negligent infliction of emotional distress must show some physical impact. 684 F.Supp. at 852. In that case, the plaintiffs could show that their well water was contaminated and

that they drank the water. Moreover, several plaintiffs had shown present physical effects. *See Bubash,* 717 F.Supp. at 301.

In the instant case, Plaintiffs do not dispute that none show present physical injury. Further, we have held that Plaintiffs have not demonstrated even that they were actually exposed to toxins; hence, Plaintiffs can not show a present physical effect of the type we discussed in *Bubash, supra.* Thus, summary judgment is appropriate and will be entered.

### C. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs have moved for partial summary judgment, arguing that we should hold that the Army committed negligence *per se* in its activities at NCAD.

Plaintiffs primarily cite *Clark v. United States,* 660 F.Supp. 1164 (W.D.Wash.1987), in which the court held a bench trial and concluded that the Air Force was *per se* negligent because of violations of various Washington state environmental statutes. *Id.* at 1176.

Defendant answers that the *Clark* opinion is distinguishable because (1) negligence *per se* is defined differently in Pennsylvania than in Washington and Plaintiffs have failed to meet Pennsylvania's standard and (2) even if the Washington definition were used, Plaintiffs have failed to meet that standard.

▆ The FTCA, under which this action was brought, requires a district court to apply the common law of the state where the act or omission in question occurred. 28 U.S.C. § 1346(b).

Plaintiffs refer to *Clark* as directly analogous. We disagree because, at the time *Clark* was decided, Washington law allowed a finding of negligence *per se* based solely upon a determination that the defendant had violated a statute. *See Henderson v. Bahl-*

---

10. We ignore, for the moment, the other three steps in the *Paoli* test for medical monitoring claims.

11. Plaintiffs' reference to any holding of *Merry* as "law of the case" is incorrect. The "law of the case" doctrine refers to previous holdings in the

case under consideration, not merely to previous holdings by the same Court. *See Fagan v. City of Vineland,* No. 92–5551, 1993 WL 290386, 1993 U.S.App. LEXIS 20327 (3d Cir. Aug. 5, 1993) (*vacated and petition for rehearing en banc granted on other grounds* ).

*man, et al.,* 50 Wash.2d 259, 310 P.2d 1077 (1957).[12]

■ Pennsylvania law establishes a more rigorous test: (1) the statute or regulation must clearly apply to the conduct of the defendant, (2) the defendant must violate the statute or regulation, (3) the violation must proximately cause the plaintiff's injuries, and (4) the intent of the statute must have been to protect the interests of the plaintiff individually rather than generally. *See Cecile Ind., Inc. v. United States,* 793 F.2d 97, 99–100 (3d Cir.1986).

■ In the briefs, Plaintiffs do not address these four considerations. While they refer to a number of federal and state statutes and regulations, they do not describe how those enactments were intended to protect the interests of Plaintiffs individually rather than the public at large. Further, Plaintiffs have not shown that there are no issues of material facts regarding precisely what the Army did and whether it violated the statutes and regulations cited. As Plaintiffs argued in response to Defendant's motion for summary judgment, the nature of the deposits at NCAD is subject to differing expert testimony.[13] We can not now conclude that Plaintiffs have met their burden of demonstrating that particular acts of Defendant violated specific statutes or regulations. Thus, summary judgment would be inappropriate. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### D. *Plaintiffs' Motion to Strike*

■ Finally, Plaintiffs ask that we strike certain paragraphs of Defendant's response to Plaintiffs' statements of material fact filed pursuant to Local Rule 401.4.

The primary basis for Plaintiffs' motion is that the Army's responses are not proper-

according to the rule and the cases interpreting it. While we might otherwise explore the issue further, we recognize that Rule 401.4 seeks to make the consideration of motions more efficient. The instant case is one of considerable duration and complexity. Were we to strike portions of Defendant's filing, we would make a lengthy and complicated process even more so. We have carefully read the documents presented by the parties and have been able to discern where factual issues remain. Thus, we will deny the motion in order that this case might progress without further, unnecessary delay.[14]

### III. *Conclusion*

As noted, these cases have been pending for several years and have accumulated voluminous filings. The trial date looms near and we would suggest at this time that the parties file a jointly prepared status report on or before November 15, 1993. That report would be brief, merely describing *precisely* what claims were made in each of the three pending cases, which of those claims have been dismissed, and which remain for trial, if any.

We will issue an appropriate order.

### ORDER AND JUDGMENT

AND NOW, this 19th day of October, 1993, upon consideration of Defendant's motion to dismiss, Defendant's motion for summary judgment, Plaintiffs' motion for partial summary judgment, and Plaintiffs' motion to strike, it is ordered that:

1. Defendant's motion to dismiss is denied.

2. Defendant's motion for summary judgment on the medical monitoring and emotional distress claims in *Redland Soccer Club, Inc., et al. v. Department of the Army* is granted and judgment is entered

---

12. Washington's legislature has since abolished common-law negligence *per se,* effective after the events in *Clark* took place. *See Hanson v. Friend, et al.,* 118 Wash.2d 476, 824 P.2d 483, 486 (1992).

13. Although, in the context of Defendant's motion, we determined ultimately that there was no dispute on the issue of Plaintiffs' exposure.

14. Plaintiffs cite other technical problems with Defendant's filings. Those problems have either been corrected or are of little consequence given our disposition on the merits.

in favor of Defendant and against Plaintiffs on those claims.

3. Plaintiffs' motion for partial summary judgment is denied.

4. Plaintiffs' motion to strike is denied.

5. The parties shall file a joint status report by November 15, 1993, identifying the issues, if any, that remain for trial. In the event that there are none, a final order will issue from which appeals may be taken.