**WESTERN GREENHOUSES, a Texas General Partnership, Billy J. Cagle and wife, Sheila J. Cagle, Norman W. Allen and wife, Kelly D. Allen, and Western Greenhouses, Inc., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 5:94–CV–059–C.

United States District Court,
N.D. Texas,
Lubbock Division.

Feb. 24, 1995.

Mark T. Mitchell and Stephen Charles Dickman, Clark, Thomas & Winters, Austin, William Everett Seymore, Darnell & Seymore, Lubbock, TX, for plaintiffs.

Adam Bain, Stephanie A. Jirard, and S. Michael Scadron, U.S. Dept. of Justice, Civil Div., Washington, DC, for defendant.

## MEMORANDUM OPINION

CUMMINGS, District Judge.

The above-styled and -numbered cause was tried to the Court. After hearing the testimony and reviewing the exhibits admitted into evidence, the Court files this Memorandum Opinion in support of the judgment to be entered in this case.

### The Nature of the Case

Western Greenhouses, a Texas General Partnership, Billy J. Cagle, Sheila J. Cagle, Norman W. Allen, Kelly D. Allen, and Western Greenhouses, Inc. (collectively "plaintiffs") brought this action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80. Plaintiffs are four individuals and two of their business entities. One of the business entities, Western Greenhouses, Inc. ("Western Greenhouses") operated a commercial greenhouse on property adjacent to Reese Air Force Base in Lubbock County, Texas. The other business, Western Greenhouses, general partnership, purchased the property on which the greenhouses are situated in July 1990.

Plaintiffs seek to recover damages for business loss and property damages from groundwater contamination allegedly caused by activities of United States employees at Reese Air Force Base.

### Reese Air Force Base

Reese Air Force Base is presently one of seven Undergraduate Pilot Training (UPT) bases in the Air Training Command of the United States Air Force. Reese has been a training base almost continually since 1941. Reese opened in June 1941 as Lubbock Army

Airfield on 2,000 acres donated by the City of Lubbock. The base was completed by the end of 1941 and training of aviation cadets began in early 1942. The Airfield operated during World War II, turning out bomber, fighter and transport pilots. In 1945 the Airfield was converted to a housing facility for veterans and their families. In 1949, the Airfield was renamed Reese Air Force Base and reactivated for pilot training. Since that time, Reese has trained pilots for the Korean War, the Vietnam War, the Persian Gulf War, and other military operations. Over the years, more than 25,000 pilots have graduated from Reese's training program. According to the Air Force, the mission of Reese Air Force Base is "to train top quality military pilots with the greatest efficiency and minimum possible cost."

## The Environmental Investigation At Reese Air Force Base And The Detection of Trichloroethylene In The Groundwater

In 1983, the Air Force began an environmental assessment of Reese Air Force Base through the Department of Defense (DOD) Installation Restoration Program (IRP). The DOD policy underlying the IRP is to identify and fully evaluate suspected problems associated with past hazardous waste management practices and to control hazards to health and welfare that resulted from those past practices. Since the DOD policy was first implemented, there has been an IRP investigation at virtually every Air Force base. The IRP was initiated at Reese prior to any regulatory requirements that the base investigate past hazardous waste management practices.

The DOD designed the IRP as a series of incremental steps for environmental investigation and remediation. If the first step of the process—which included a review of base records and witness interviews—identified a potential environmental problem, then further study, including field testing and analysis, may be warranted. If the investigation confirmed an environmental problem, then the Air Force considered actions to remediate the problem.

During every step of the IRP process, the Air Force must balance social, economic and political policy considerations. The Air Force has a limited budget to address environmental contamination at its bases. Consequently, the Air Force must assess the severity of environmental contamination at each base and allocate its limited funds accordingly. Each decision in the IRP process at Reese, including decisions regarding the type of monitoring well system to use to investigate groundwater contamination, the manner of investigating potential off-base contamination, the manner of remediating contaminated areas on base, and the types of public disclosures to make about the investigation, involved balancing social and economic policy considerations within the strictures of the Air Force's environmental budget.

There were no specific and mandatory statutes or regulations which controlled the Air Force's investigation and remediation of contamination under the IRP or its decisions regarding public notification of information obtained through the program.

In 1984, the Air Force completed the initial phase of the IRP and identified several areas at the base which warranted further study, including Industrial Lake and Sewage Lake. Pursuant to the IRP, the Air Force decided to monitor the groundwater in these areas to determine whether contaminants were entering the groundwater from the playas. Throughout the IRP, the Air Force kept regulatory agencies informed of IRP activities, and the Air Force often submitted proposed IRP investigation plans to state and federal environmental regulatory agencies for review and comment.

Concurrent with the ongoing IRP investigation at Reese, the Air Force was corresponding with state and federal regulatory agencies to determine the regulatory status of Industrial Lake and Sewage Lake under the Resource Conservation and Recovery Act (RCRA). During the early 1980s, the State of Texas had found Reese to be in compliance with the provisions of RCRA. Subsequently, however, a question arose regarding whether the playa lakes were "surface impoundments" subject to RCRA regulation. The Air Force asked the state regulatory agencies for guidance regarding the regulation of the lakes, but the responses of the state were

inconsistent. First, in 1985, the Texas Water Commission (TWC) issued a permit to Reese Air Force Base for disposal of waste into the lakes, and, pursuant to the permit, the Texas Department of Health found Reese to be in general compliance with its hazardous waste regulations. However, in 1986, the state decided to take a different position, and it concluded that the playa lakes should be regulated under RCRA as surface impoundments. Subsequently, the Air Force attempted to comply with the RCRA requirements.

In 1987, the Air Force tested water supply wells at the base. The Air Force initially tested these wells to obtain "background samples" to help it determine whether Sewage Lake or Industrial Lake was contaminating the environment. Pursuant to the Reese sampling protocol under the IRP, the Air Force tested for many specific chemicals including trichloroethylene (TCE). These background samples detected small quantities of TCE in two Air Force water supply wells.

Shortly after discovery of TCE contamination in water supply wells at Reese Air Force Base, the Air Force called a meeting with federal, state and local officials to discuss the situation. The regulatory officials at the meeting were not particularly concerned about the TCE discovery given the low levels detected. Subsequently, however, the Texas Water Commission (TWC) agreed to assist the Air Force in testing private wells off base to determine whether any chemical contamination was migrating past base boundaries. The TWC assumed responsibility for public notification and represented that it would wait for retesting and for a wider sampling effort before it made any report to the State Emergency Response Committee for purposes of public notification. During early 1988, the Air Force and the TWC tested five off base wells, including one well at property now owned by plaintiffs. The tests detected a minute concentration of TCE (1.1 part per billion) in one off-base well which was owned by a barber shop. This concentration of TCE was well below the EPA's maximum contamination level for TCE of 5 parts per billion. Subsequently, after additional sampling was done, the Texas Water Commission notified the Emergency Response Committee which ultimately notified local officials pursuant to state law.

In early 1988, the Air Force decided to add a large area in the central portion of the base to the Air Force IRP investigation effort in order to determine the source of the TCE contamination detected in the base water supply wells. This area was named the "Tower Area." The Air Force installed many monitoring wells in the Tower Area to try to pinpoint the source of the TCE contamination. The Air Force also continued to test wells outside the boundary of Reese Air Force Base to determine whether any significant contamination was migrating past base boundaries. In early 1993, as part of this testing, the Air Force detected small concentrations of TCE contamination in wells on plaintiffs' property and other off-base properties. The Air Force immediately provided bottled water to the affected properties.

In early 1992, even before the Air Force ever detected any contamination on plaintiffs' property, the Air Force connected plaintiffs' residences to a public water supply system through Reese Air Force Base. The Air Force took this precautionary measure because plaintiffs' residential wells were located in close proximity to base monitoring wells which showed TCE contamination. (Tests of wells on plaintiffs' property showed no TCE contamination up to this point in time.) In 1993, after the Air Force detected TCE contamination in wells supplying water to plaintiffs' greenhouses, the Air Force installed a filtration system for these wells. This filtration system ultimately effectively removed TCE from the water supply for plaintiffs' greenhouses.

In 1994, Air Force agreed to a consent order with the EPA regarding the off-base TCE contamination. Under the terms of the agreement, the Air Force must provide water that meets safe drinking water standards to any private well owner with TCE contamination. The Air Force has been committed to providing plaintiffs with a clean, safe and adequate water supply. While the Air Force could not guarantee that it would provide plaintiffs' residence with a cost-free public

water supply indefinitely, the Air Force did assure plaintiffs that the water for their homes and business would always meet safe drinking water standards.

### The Historic Use Of Trichloroethylene At Reese Air Force Base

To maintain the aircraft at Reese Air Force Base, Air Force employees used various solvents to clean engine parts. One of the solvents that the Air Force used was TCE. TCE was a very effective degreaser, and the Air Force used it for several years. Gradually, the Air Force replaced TCE with less toxic degreasers including trichloroethane (TCA). There has been very little TCE use at Reese during at least the last fifteen years. Shop files which date back to the late 1970s mention TCE use in only one shop. The files show that the Air Force only used a small amount of TCE (16 ounces per day) in the NDI Shop in Building 89A during 1981 and 1982. Waste TCE from this operation was containerized in fifty-five gallon drums for disposal. There is no reference to TCE in any of the other shop files. Additionally, Air Force surveys of the Reese maintenance shops in 1984, 1988 and 1991 did not reference any current TCE use in the maintenance shops.

Shops that probably used TCE at Reese Air Force Base were located adjacent to Reese's flight line. The drains for these shops were connected to an underground storm sewer which led to Industrial Lake situated in the southeastern part of the Base.

The waste management practices at Reese Air Force Base were consistent with those employed at other military installations—and by industry in general—during the 1940s through the 1970s. If waste TCE was disposed into the industrial drain line during this period, the practice would have been consistent with waste disposal practices throughout the military and industry. The use of clay sewers to receive solvents was also consistent with standard practice at that time. Waste management practices did not begin to change until the passage of environmental statutes such as RCRA, Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and implementing regulations in the late 1970s and 1980s.

### The Industrial Drain Line At Reese Air Force Base

After the discovery of TCE contamination in base water supply wells, the Air Force, through its IRP investigation, identified the Reese industrial drain line as a possible source of the TCE contamination in the Tower Area. Prior to that time, state and federal regulators had never identified the industrial drain line at Reese Air Force Base as a potential contamination source despite numerous environmental inspections of the base. In fact, as late as June 1988, a contractor for the EPA identified seventy-nine solid waste management units (SWMUs) during a RCRA facility assessment—assessments which often identify drain lines as SWMUs—but failed to identify the Reese industrial drain line as a potential contamination source or even as a SWMU.

Surveys of sewer lines were uncommon in industry from the 1940s through the 1970s. Additionally, there were few manholes in the Reese industrial drain line, making it virtually impossible to determine the condition of the sewer in the northern shop area. Because the sewer was underground and lacked the necessary manholes for a complete inspection, the Air Force was unable to determine the deteriorated condition of the line until recently when it videotaped the sewer.

### The Origin Of The Trichloroethylene Present In Plaintiffs' Wells

The northern portion of the hanger line shop area, including a portion of the Reese industrial drain line, is the only potential contamination source area on Reese Air Force Base which could be associated with the contamination detected in plaintiffs' wells. Contamination from other areas on base would not move through the groundwater toward plaintiffs' wells. For example, the direction of groundwater flow at Industrial Lake and Sewage Lake is to the east and southeast, while plaintiffs' wells are northeast of these lakes. Thus a continuous TCE plume cannot be shown between plaintiffs' wells and any area other than the northern hangar line shops.

If the source of TCE in plaintiffs' wells is the northern hangar line shop area, the TCE

responsible for plaintiffs' contamination was probably disposed prior to the mid 1970s. The rate of groundwater flow in the aquifer is approximately 228 feet per year. Given this rate of movement, all of the TCE contamination which is now present in the groundwater beneath plaintiffs' property was released into the environment over twenty years ago. This interpretation of groundwater flow is supported by the chemical data. Soil gas surveys detected trichloroethane (TCA) in the shop area, but no TCA plume exists in the groundwater. Shop records indicate that Reese commonly used TCA as a solvent in the 1970s and 1980s. If the TCE contamination present in groundwater beneath plaintiffs' property had originated in the 1970s and 1980s, one would expect to see a TCA plume coincident with the existing TCE plume because the transport characteristics of the two chemicals are virtually identical. The lack of any TCA plume shows that the release must have occurred prior to the mid 1970s, and probably much earlier.

There is no evidence that TCE migration in the vicinity of Reese Air Force Base has occurred in any form except as dissolved TCE which moves in the prevailing direction of groundwater flow.

The detection of TCE in wastewater samples collected at Reese in the mid–1980s was consistent with TCE discharges from earlier decades. A part of the TCE discharged in decades prior to the 1980s would necessarily have been absorbed in sediments along the wastewater pathway, providing a reserve of absorbed TCE which would dissolve slowly over the following years. The minute TCE concentrations detected in the Reese wastewater stream in the 1980s are therefore artifacts of TCE disposal during prior decades.

## The Environmental Effect Of Trichloroethylene

There are no primary or secondary deleterious effects on plants from exposure to water containing TCE at the concentrations detected in plaintiffs' wells. Based on the scientific literature, the concentrations of TCE in the groundwater which plaintiffs used were several orders of magnitude below the concentration levels necessary to elicit acute or chronic toxicity in plants. Further, because of the likely volatilization of TCE during plant watering, the concentrations of TCE which would actually be in water reaching the plants were even less than the concentrations detected in groundwater. Any concentrations of TCE that remained in the water would be rapidly depleted upon reaching the plants, minimizing the potential for exposure. Surface soils containing plants metabolize and degrade TCE very rapidly. Additionally, a test of a plant from Western Greenhouses did not detect any TCE.

There is no basis for any concern on the part of Western Greenhouses' customers or employees regarding exposure to plants that were provided with water containing the small concentrations of TCE detected in plaintiffs' wells. Given the minute concentrations, the potential for exposure of either customers or employees was extremely remote or negligible. No regulatory agency ever quarantined or threatened to quarantine any of the plants grown at the Western Greenhouses facility.

EPA conservatively regulated TCE as a probable human carcinogen despite the lack of medically recognized, scientifically valid evidence that low levels of TCE can cause cancer or other illnesses in humans. The EPA classified TCE as a "probable human carcinogen" based on positive evidence of liver tumors in a particular strain of laboratory mice given large doses of TCE. There are no human studies which support the EPA classification.

Congress and the EPA believed that there were no safe threshold levels for any potential human carcinogens. Accordingly, because the EPA classified TCE as a probable human carcinogen, the EPA conservatively set the maximum contaminant level goal (MCLG) for TCE—as it did for all chemicals classified as probable human carcinogens—at zero. The EPA decided to set the enforceable MCL for chemicals classified as probable human carcinogens as close to the MCLG of zero as feasible. The EPA determined that TCE could be reliably detected at levels as low as 5 ppb, and that municipal water supplies could be economically cleaned to that level. Accordingly, in July 1987, the EPA set the MCL for TCE at 5 ppb.

The EPA has apparently recently undertaken a review of TCE to determine whether or not it should even be classified as a "probable human carcinogen."

### Knowledge of Furr's, Inc. et al.

The plaintiffs purchased the greenhouse property on July 5, 1990 from Furr's, Inc., Mex/Tex Realty Company, and LSP & Co. These sellers of the property either had prior knowledge or should have known of the fact that some of the groundwater wells on or adjacent to the greenhouse property had been sampled by the Air Force, the Corps of Engineers or their contractors as far back as 1988, and that the TCE plume had migrated onto or was imminently threatening to migrate onto the property sold to the plaintiffs.

Nevertheless, Furr's, Inc., Mex/Tex Realty Company, and LSP & Co., during negotiations with the plaintiffs prior to July 5, 1990, apparently failed to disclose to the plaintiffs that the groundwater wells had been tested and that the groundwater at Reese and adjacent properties to the east was the subject of an ongoing investigation by the Air Force and its contractors.

### Lack Of Due Diligence By The Plaintiffs

Plaintiffs contributed to their own ignorance of the potentially contaminated condition of their property. The Small Business Administration required a Phase I Site Assessment of the property plaintiffs intended to buy. Mr. Cagle retained Parkhill, Smith and Cooper, Inc. (PSC) to perform the assessment. The evidence is not clear when PSC was first contacted by plaintiffs. The purpose of any Phase I assessment is to determine if there is anything that raises a suspicion of an environmental problem with the property which merits further inquiry. Robert McMillen of PSC quoted a price of 1200 to 1400 dollars to Mr. Cagle for the Phase I assessment of the 40–acre property. Mr. Cagle indicated that the quoted price for the assessment was too high and that he wanted the assessment to be "dirt cheap." Mr. Cagle and Mr. McMillen agreed on a price of less than one thousand dollars. Given the limited budget that Mr. Cagle had given to PSC for the assessment, PSC limited the scope of its investigation. The PSC investigation and site visit were conducted on July 19, 1990, which was two weeks after the plaintiffs had already purchased the greenhouse property.

### Plaintiffs' Alleged Damages

Plaintiffs have suffered no diminution in the value of their residential properties as a result of the TCE detected in their wells. The Allen and the Cagle residences have public water supplies at their property, which Reese Air Force Base provided at no cost to Allen or Cagle. In March 1992, the Air Force notified Mr. Cagle that one of the wells at Reese Air Force Base, near Cagle's property, showed TCE contamination. Even though tests of wells on plaintiffs' property had not revealed any detectable contamination up to that time, the Air Force offered to work with Mr. Cagle to assure a safe source of drinking water for his home. Subsequently, the Air Force connected Mr. Cagle's residence and Mr. Allen's residence to a public water supply through the base.

Plaintiffs have not demonstrated any lost business profits attributable to the contamination. The accounting of Western Greenhouses' earnings is calculated on a July to June fiscal year. From July 1991 through June 1992, Western Greenhouses had $5,333 in taxable income. From July 1992 through June 1993, Western Greenhouses had $147,-395 in losses. The losses in fiscal year 1993 cannot be attributed to the contamination because the losses all occurred prior to August 1993, when plaintiffs' insurance was cancelled. Plaintiffs have not demonstrated that they suffered any losses in sales which were related to the contamination, prior to July 1, 1993, to explain their business losses for fiscal year 1993.

Plaintiffs have not demonstrated any profit history for Western Greenhouses from which one could calculate future lost profits with any degree of certainty. According to plaintiffs' own accounting, the business earned only $4,956 in fiscal year 1991 and only $5,333 in fiscal year 1992. The business lost $147,395 in fiscal year 1993, a loss which cannot be attributed to the contamination because the loss occurred before the cancellation of their insurance. Accordingly, wholly aside from the water problem, the busi-

ness failed to show any consistent earnings history. This inconsistent earnings history for Western Greenhouses reflects business expenses that were outside the normal range for similar businesses in the industry. For example, Western Greenhouses' overall operating expenses greatly exceeded the industry average, but their advertising expenses fell below the industry average.

In an attempt to establish an earnings history for their business, plaintiffs inappropriately added officer compensation, rent and interest to the taxable income for past fiscal years to compute earnings. According to textbook valuation theory, officer compensation, rent and insurance are necessary expenses of the business. Thus, to add these items to the taxable income of the business is to overstate profits.

The alleged offer to buy Western Greenhouses for 1.7 million dollars in 1992 is not credible and carries no weight in the damage calculation. The offer does not meet basic criteria for reliability. The offeror, Mr. Dale Kincer, is a long-time friend of the Cagle and Allen families. Mr. Kincer made the alleged offer through an informal letter and paid no earnest money. Mr. Kincer had no experience in the greenhouse business and had never bought an ongoing business before. Mr. Kincer did not tell his business partner of his intent to buy the greenhouses, and he did not even divulge his intentions to the person he claims he wanted to operate the business. Finally, neither Mr. Cagle nor Mr. Allen informed the two other shareholders in Western Greenhouses, Ray Stuart and Rex Henderson, of this offer.

Furthermore, plaintiffs made no reasonable efforts to mitigate their alleged damages. For example, after plaintiffs' insurance was cancelled, plaintiffs did not diligently seek to obtain alternative insurance. Instead, plaintiffs immediately planned to close their business. Also, plaintiffs did not present any evidence to their customers or insurance companies regarding the Air Force's commitment to provide a clean and adequate water supply to the greenhouse. Plaintiffs did not attempt to secure any scientific opinions regarding the effect of the TCE detected in their wells on the quality or safety of their plants. Instead, plaintiffs made a few calls to insurance agents who were their personal friends or acquaintances but made no follow-up inquiries.

Had plaintiffs made reasonable efforts to mitigate their damages, their business would not have suffered due to contaminated water. This is demonstrated by the successful greenhouse operation of Ray Stuart. After Western Greenhouses decided to go out of business, Mr. Stuart, a shareholder in Western Greenhouses, planned to open a greenhouse business across the street from Western Greenhouses. Mr. Stuart's greenhouse is apparently located adjacent to, if not on, the plume of contamination. Although Florist Mutual Insurance Co., the original insurer for Western Greenhouses, denied insurance to Mr. Stuart, he was able to obtain alternative insurance from Trinity Universal Insurance Co. Additionally, despite the insured cancellation, Western Greenhouses continued to do business until the end of 1993. Most customers of Western Greenhouses continued to buy plants from the greenhouse after tests detected TCE contamination in the greenhouse wells.

At most, plaintiffs' greenhouse property has been damaged by $25,000 as a result of the contamination. Damages occur at the greenhouse property due to the fact that the Air Force would require access to the property to test the water and to maintain the filtration equipment on plaintiffs' wells. This access requirement diminishes the value of the property by no more than five to ten percent of its normal market value.

Aside from the administrative claim which is the subject of this suit, plaintiffs filed six administrative claims for damages with the Air Force. These six claims were for damages allegedly caused by the Air Force's efforts to install and maintain a filtration system for plaintiffs' water supply. The Air Force has resolved these claims with plaintiffs in exchange for a release from plaintiffs.

Having made factual findings, the Court now applies to those facts the law that is applicable in this case.

## Common Law Negligence Theory

■ The Court concludes that the United States was not negligent. Air Force employees at Reese Air Force Base did not breach any duty of due care to protect plaintiffs from reasonably foreseeable harm. Under the Federal Tort Claims Act (FTCA), plaintiffs must demonstrate, among other things, that the United States was negligent "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Therefore, to establish negligence, plaintiffs must meet the requirements for negligence under Texas law.

■ Under Texas law, a defendant cannot be negligent if the harm to plaintiffs was not reasonably foreseeable at the time of the alleged negligent act. To support a finding of negligence, plaintiffs must show that the Air Force had a duty to use due care to protect plaintiffs from injury, that the Air Force breached that duty, and that the breach was a proximate and legal cause of plaintiffs' injuries. *See, e.g., Lucas v. Texas Indus.,* 696 S.W.2d 372, 376–77 (Tex.1984). In order to prove proximate cause, plaintiffs must prove foreseeability. *Hall v. Martin,* 851 S.W.2d 905, 911 (Tex.Ct.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994). The law of foreseeability requires that a person of ordinary prudence (using ordinary care) should have anticipated the damage to others caused by the person's alleged negligent act. *See Clark v. Waggoner,* 452 S.W.2d 437, 439–40 (Tex.1970); *Clark v. South Loop Nat'l Bank,* 740 S.W.2d 471, 472–73 (Tex.Ct.App.1987).

During time periods when government employees may have committed acts that ultimately contaminated groundwater underlying plaintiffs' property, the employees did not know, and had no reason to know, that their acts could result in plaintiffs' property damages. Because of the travel time necessary for contaminants to reach plaintiffs' property from the Reese shop area, only waste disposal practices occurring there prior to the mid 1970s are relevant for the negligence inquiry. Given the state of knowledge and the standard of industry practice during the period between the 1940s and the 1970s, Reese employees had no reason to know that their waste disposal or maintenance activities could lead to plaintiffs' damages.

The Air Force was not negligent in the investigation and monitoring of the groundwater supply, and it was not negligent in failing to warn the public of the TCE findings. The Texas Water Commission in late 1987 assumed jurisdiction and the responsibility of determining if and when the public should be notified.

## Discretionary Function Exception

The "discretionary function" exception limits the FTCA's general waiver of sovereign immunity for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

■ The United States Supreme Court has promulgated a two-part test for applying the "discretionary function" exception: (1) the challenged conduct must involve an element of judgment or choice, and (2) the judgment or choice must be based on considerations of public policy. *United States v. Gaubert,* 499 U.S. 315, 322–23, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991); *see also ALX El Dorado, Inc. v. Southwest Savs. and Loan Ass'n/FSLIC,* 36 F.3d 409, 411 (5th Cir.1994). Discretionary conduct is not limited to only the policy level. *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a particular given case." *Id.* (citing *Varig Airlines,* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984)).

■ If a federal statute, regulation, or policy specifically prescribes a course of conduct, the discretionary function exception does not apply. *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). In these situations, the employee effectively has no choice, and the only issue is whether the employee followed the directive. *Dalehite v. United States,* 346

U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). If he followed the directive, the government is immune from liability under the first clause of 28 U.S.C. § 2680(a), because the employee's conduct is deemed to be in furtherance of the policies which led to the promulgation of the policy. *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968.

■ The IRP was intended to identify and fully evaluate suspected problems associated with past waste management practice on Department of Defense (DOD) facilities and to control the migration of hazardous constituents from such facilities. Under DOD policy, the IRP was to be implemented in four phases. In Phase I, the department attempted to identify potential problems through searching records. In Phase II, the Department conducted on-site testing. Phase III included the development of technology to remedy the problem if applicable, and Phase IV involved the implementation of selected remedial options. This process was eventually condensed into three phases after the passage of Superfund Amendments and Reauthorization Act in 1986. Plaintiffs fail to plead or produce any evidence of negligence in connection with the adoption of the IRP. To the extent the IRP provides any specific mandates, plaintiffs have failed to plead or prove that Reese officials either failed to comply with or violated these directives. To the extent that the IRP allows Reese officials discretion, then these decisions must be analyzed under the second prong of the *Berkovitz* test.

For those actions involving discretion, the focus of the inquiry shifts from whether the alleged negligence involved discretion to the second prong of the analysis which analyzes whether this type of discretion is protected.

■ The discretionary function exception only protects those decisions grounded in public policy. *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). If a regulation allows an employee discretion, the very existence of the regulation creates a strong presumption that the discretionary act authorized by the regulation involves the same policies which led to the promulgation of the regulations. *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274.

"When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274.

■ The DOD designed the IRP to balance several conflicting goals. The IRP attempted to: 1) Advise the EPA and local governments of IRP activities; 2) Maintain IRP as a basis for response to CERCLA; 3) Prioritize and coordinate remediation efforts in order to maximize the efficient use of DOD resources. When officials contemplate the plethora of issues surrounding the decisions concerning investigation, monitoring and public notification, these officials directly engage in making public policy. *See, e.g., Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1538 (10th Cir.1992); *Lockett v. United States,* 938 F.2d 630, 639 (6th Cir.1991); *U.S. Fidelity & Guar. Co. v. United States,* 837 F.2d 116, 122 (3d Cir.1988). The specific policy objective or acknowledgement that budgetary concerns were of the utmost importance removes these types of decisions from the ordinary decisions that have minimal impact on budgets that the discretionary function exception was not designed to protect. *See ARA Leisure Servs. v. United States,* 831 F.2d 193, 196 (9th Cir.1987). Plaintiffs have failed to produce any evidence to overcome the presumption that Reese officials were grounded in policy when making decisions concerning the investigation, monitoring and public notification of potential contamination.

In *Redland Soccer v. Department of Army,* a Pennsylvania district court held that the Army was not entitled to protection from the FTCA through the discretionary function, because the discretionary decisions concerning where to place a landfill, what to commit to the landfill, and whether to transfer the contaminated land, fell outside of the Army's congressionally delegated mission. *Redland Soccer Club v. Dep't of Army,* 835 F.Supp. 803, 809 (M.D.Pa.1993). The court analogized the Army's decisions to be more akin with the discretion involved in driving

an automobile than with the type of discretion involved in policy making decisions. *Id.*

This Court cannot agree that an agency only implicates public policy when it acts within its congressionally delegated mission. This shifts the focus of the analysis from the nature of the decision to its categorical type. This is inconsistent with Fifth Circuit precedent. *See Ford v. American Motors Corp.,* 770 F.2d 465 (5th Cir.1985) (holding that U.S. Postal Service was entitled to protection under discretionary function exception when selling used vehicles). Under *Redland Soccer,* courts would be forced to determine the scope of the mission or missions that Congress has delegated to each agency and whether each decision implicated this mission. This court believes that this was not the type of invasive inquiry the Supreme Court has contemplated in its prior holdings. *See Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275 (rejecting argument that the discretionary function only applies to decisions made at the planning level). The invasive inquiries required under *Redland Soccer* are completely inconsistent with the underlying assumptions of the discretionary function exception which is to avoid judicial interventions that disrupt the separation of powers doctrine.

Even if the *Redland Soccer* analysis were applied to these facts, plaintiffs have failed to demonstrate that the defendant's actions were not in the furtherance of national defense. Reese was not a NPL facility; therefore, the costs of any remediation efforts were incurred directly by the Air Force. As plaintiffs have conceded in a prior motion for summary judgment, Reese would be required to fund remediation efforts through the operations and management budget (O & M). This concession creates two difficulties for plaintiffs. First, any decision that would deplete the O & M fund clearly implicates national defense mission, because it directly impacts the military preparedness. In addition, any sacrifices made for remediation efforts involve the type of discretion that clearly implicates public policy. Deciding how much the O & M fund must be depleted for remediation efforts implicates public policy to a far greater degree than the mere mechanical discretion associated with driving an automobile. These sacrifices force decision makers to balance two of the nation's top priorities: national defense and environmental protection. Few decisions could have a greater impact on public policy. Decisions concerning how to investigate, monitor and notify about remediation efforts are distinguishable from the dumping activities that were denied protection in *Redland Soccer.*

In this case, the discretionary function exception prohibits plaintiffs from challenging Air Force decisions regarding the investigation and remediation of environmental contamination at Reese Air Force Base and decisions regarding public notification of the results of the investigation.

### Nuisance or Trespass

 The Court does not have jurisdiction over plaintiffs' nuisance claim or trespass claim to the extent plaintiffs seek to impose liability against the United States through those claims without proving negligence. The Federal Tort Claims Act does not waive the sovereign immunity of the United States with regard to strict liability claims. *Laird v. Nelms,* 406 U.S. 797, 801–03, 92 S.Ct. 1899, 1902–03, 32 L.Ed.2d 499 (1972). The statute requires a negligent act. *Dalehite v. United States,* 346 U.S. 15, 45, 73 S.Ct. 956, 972, 97 L.Ed. 1427 (1953). Under Texas law, proof of negligence is not essential to the imposition of liability for the creation or maintenance of a nuisance. *See, e.g., King v. Columbian Carbon Co.,* 152 F.2d 636, 638–39 (5th Cir.1945). Likewise, a trespasser can be liable without reference to negligence or the exercise of care. *See, e.g., General Tele. Co. v. Blacksher,* 742 S.W.2d 465, 468 (Tex.Ct.App.1987); *Brown v. Dellinger,* 355 S.W.2d 742, 745 (Tex.Ct.App. 1962). Under the Federal Tort Claims Act, however, plaintiffs cannot maintain a nuisance or trespass claim without proving negligence as part of that claim. *Dalehite,* 346 U.S. at 44–45, 73 S.Ct. at 972–73.

### Negligence Per Se

 The United States was not negligent *per se.* To support a finding of negligence *per se,* plaintiffs must show that the United States violated a statute that con-

tained a standard of care applicable to the United States. Additionally, under Texas law, plaintiffs must show that (1) one of the purposes of the statute is to set up a standard of conduct calculated to protect the class of persons to which plaintiffs belong, and (2) the plaintiffs' injuries are of the nature that the statute was designed to prevent. *See, e.g., El Chico Corp. v. Poole,* 732 S.W.2d 306, 312 (Tex.1987).

 CERCLA and RCRA are strict liability statutes that fail to define a standard for conduct. *In re Bell Petroleum Servs., Inc.,* 3 F.3d 889, 897 (5th Cir.1993) (CERCLA), and *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 740 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (RCRA). Although no Texas courts have specifically addressed whether section 26.121 of the Texas Water Code defines a standard of conduct suitable for the application of negligence *per se,* Texas courts have held that similar statutes fail to define such a standard. *Murfee v. Phillips Petroleum Co.,* 492 S.W.2d 667, 673 (Tex.Ct.App.1973). The Court believes that when Texas courts consider section 26.121, they will construe it in a similar manner.

 The United States did not violate any statute applicable to government employees at Reese Air Force Base that was designed to create a standard of care to protect plaintiffs from the type of injuries that they have allegedly suffered. Even if negligence *per se* theories could be applied under the facts and law, there has been no proof that such violations were a cause-in-fact of any of the damages alleged by plaintiffs.

### Res Ipsa Loquitur

 Plaintiffs have not met the requirements for the application of *res ipsa loquitur* under Texas law. Plaintiffs have not demonstrated that the contamination of groundwater is the kind of event which ordinarily would not have occurred in the absence of negligence. *See Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex.1982); *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 250 (Tex.1974). In fact, standard industry practices through-

out the period between the 1940s and the 1970s unfortunately led to widespread contamination of the environment across the country.

### Plaintiffs' Negligence

 Plaintiffs' own negligence is responsible for their failure to detect the presence of contamination in close proximity to their property before purchasing the land. Under Texas law, the negligence of plaintiffs completely bars recovery if it is greater than the negligence of the party against whom recovery is sought; otherwise, the damages are diminished in proportion to the amount of negligence attributed to the person recovering. Tex.Civ.Prac. & Rem.Code Ann. §§ 33.001, 33.012 (West Supp.1993). *See also Bradshaw v. Freightliner Corp.,* 937 F.2d 197, 203–04 (5th Cir.1991). Here, plaintiffs acted unreasonably in seeking a "dirt cheap" Phase I environmental assessment, when a proper and complete Phase I environmental assessment would have disclosed to plaintiffs the true extent of the known environmental contamination at Reese Air Force Base. Plaintiffs also failed to have a timely environmental assessment done prior to the plaintiffs actually purchasing the greenhouse property.

### Conclusion

Thus, the preponderance of the material and credible evidence establishes that plaintiffs did not carry their burden of proving negligence, negligence *per se,* nuisance, trespass, or *res ipsa loquitur* under Texas law and the Federal Tort Claims Act. Judgment on all claims will be entered against plaintiffs and in favor of the United States.