**SHEA HOMES LIMITED PARTNERSHIP,**
Plaintiff,

v.

**UNITED STATES OF AMERICA,**
Defendant.

No. C04–0092 TEH.

United States District Court,
N.D. California.

Nov. 10, 2005.

James Joseph Dragna, Audrey May Huang, Tiffany Roxanne Hedgpeth, Bingham McCutchen LLP, Los Angeles, CA, for Plaintiff.

Mark Albert Rigau, Henry Thomas Miller, United States Department of Justice, Washington, DC, U.S. Dept of Justice, San Francisco, CA, for Defendant.

### ORDER GRANTING MOTION TO DISMISS CLAIMS FOUR THROUGH TEN

HENDERSON, District Judge.

This matter came before the Court on July 11, 2005, on Defendant's Motion to Dismiss the fourth through tenth claims in this action under Fed.R.Civ.P. 12(b)(1), or alternatively, Fed.R.Civ.P. 56(c). Defendant contends that this Court is barred, under Section 113(h) of CERCLA, from exercising jurisdiction over Plaintiff's fourth through tenth claims because they improperly seek to challenge the government's ongoing clean up of a contaminated site. Defendant also contends that this Court lacks jurisdiction over Plaintiff's fifth through tenth claims on the ground that they are barred by the discretionary function and misrepresentation exceptions to the FTCA. Having carefully considered the parties' extensive written and oral arguments, supplemental filings, and the entire record herein, the Court grants Defendant's motion for the reasons set forth below.

## I. BACKGROUND

On September 2, 1999, Plaintiff, Shea Homes Limited Partnership ("Shea") purchased a 10 acre parcel of property in Novato, California, which was previously part of the Hamilton Air Force Base ("HAFB") prior to its closure in 1974. On December 30, 1999, Shea acquired an adjoining 18 acre parcel. The combined 28 acre property adjoins a part of the former HAFB which used to be the primary repository for garbage generated at the HAFB (including solid and hazardous wastes) from the early 1940s until 1974. This area is now referred to as Landfill 26 ("LF 26"). It is roughly 47 acres in size, and consists of a 200 foot buffer zone surrounding a 30 acre landfill "cap" that covers the area where the garbage was formerly deposited. Shea, a large residential housing developer, developed the 28 acres it purchased in 1999, and has transferred ownership of some or all of the property to third-parties. It contends, however, that Defendant, the United States, failed to meet its obligations to address the contamination at LF 26, causing Shea to suffer damages.

Since 1986, the United States Army Corps of Engineers ("Corps") has been in engaged in various efforts to investigate, remediate, and monitor the waste in LF 26 pursuant to the Defense Environmental Restoration Program—Formerly Used Defense Sites ("DERP–FUDS") and orders issued by the Regional Water Quality Control Board ("RWQCB"). The basic remedy chosen was the installation of the cap, referenced above, which was installed in 1994–95 and covers the landfill, a ground water treatment system, and a gas perimeter monitoring network.

In June 1996, methane in excess of 5.7% by volume was detected at one of the LF 26 perimeter gas monitoring probes ("GMP")—GMP No. 5. Further sampling in early and mid 1999 did not detect methane in excess of 5% by volume. In September 1999, however, after Shea's purchase of the first 10 acre parcel, methane was again detected in excess of 5 % by volume at GMP 5 (17.3%) and GMP 9 (9.8%). Subsequent monitoring in October 1999 and December 1999 did not detect methane in excess of 5%.

In October 1999, the RWQCB did not approve final closure of the site and ordered further landfill gas sampling. In June 2000, the Corps began a supplemental testing program. By the Fall of 2000, the Corps determined that methane might be migrating off-site from LF 26 in excess of 5% by volume and that further action was required. On February 7, 2001, the RWQCB directed the Corps to submit a plan to, *inter alia,* reduce methane to below compliance levels. In March 2001, the Corps proposed and evaluated seven approaches for controlling methane migration. In April 2001, the RWQCB raised various concerns with respect to the proposed remedial options, and directed the Corps to implement (1) an interim stopgap measure to immediately intercept gas migrating from LF 26 and towards the Hamilton Meadows development, (2) a long-term management plan of methane at its source, and (3) a time-schedule for implementing the gas collection and treatment activities.

In December 2001, the RWQCB issued Cleanup and Abatement Order ("CAO") 01–139 requiring the Corps to investigate, design, and implement a final remedy with respect to the methane or face civil penalties. Between January 2002 and January 2003, the Corps installed a 1600 foot Vent Trench with an impermeable liner in the buffer zone area between the landfill cap and Shea's property in order to intercept any landfill gas prior to migrating off-site. The Corps is currently evaluating the effectiveness of the Trench. The Corps is also working under a RWQCB-imposed deadline of September 30, 2006 for the installation and operation of a "Landfill Corrective Action [gas control system]." *See* Def.'s Ex. 31 at 10.

Shea does "not challenge[ ] the remedy selected by Defendant to abate the contamination." Pl.'s Opp. at 2. It complains, however, that the Corp has failed to properly and timely implement its remedy and to satisfactorily abate the contamination, causing it to suffer damages. *Id.* at 1–2. The instant action seeks monetary damages and injunctive relief. Specifically, the complaint asserts claims for (1) cost recovery and contribution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., (2) for injunctive relief under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and (3) tort damages based on claims of public and private nuisance, trespass, negligence, negligence per se and equitable indemnity.

Defendants subsequently filed the instant motion under Fed.R.Civ.P. 12(b)(1) to dismiss the RCRA and tort-based

claims on the ground that the claims are barred by (1) exceptions to the Federal Tort Claims Act, and/or (2) section 113(h) of CERCLA.[1] The Court addresses these arguments in turn.

## II. *FEDERAL TORT CLAIMS ACT*

■ Defendant contends that this Court lacks jurisdiction over Plaintiff's state law tort claims because they fall within the discretionary function exception to the Federal Tort Claims Act ("FTCA"), which provides for a limited waiver of sovereign immunity from claims for damages against the United States. *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). It is the government's burden to demonstrate that this exception applies. *Prescott v. U.S.*, 973 F.2d 696, 703 (9th Cir.1992).

■ The discretionary function exception to the FTCA "is a statutory reservation of sovereign immunity for a particular class of tort claims." *Gager v. United States*, 149 F.3d 918, 920 (1998). It provides that liability under the FTCA shall not extend to a claim:

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused.

28 U.S.C. § 2680(a). The basic purpose of the exception is to protect the government from "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660

(1984). It "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Aragon v. United States*, 146 F.3d 819, 822 (10th Cir.1998).

■ In *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the Supreme Court established a two-tier analysis for identifying which governmental functions are discretionary for purposes of the exception. First, a court must examine whether the challenged conduct involves an element of judgment or choice, since "conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. Conversely, the exception does not apply if the statute, regulation, or policy at issue prescribes a specific course of action. *Aragon v. United States*, 146 F.3d 819, 823–24 (10th Cir.1998). In such a case, the employee has "no rightful option but to adhere to the directive." *Id.*

■ If the Court finds that the challenged conduct was "discretionary," then the court must analyze whether the discretion exercised was of the type that the exception was designed to shield—i.e., choices that are grounded in social, economic, and political policy. *Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335. The exception extends from broad policy decisions made at the highest levels to "low-level employees making discretionary day-to-day management decisions based on policy considerations." *Childers v. U.S.*, 40 F.3d 973, 974 n. 1 (9th Cir.1995).

1. While Defendant alternatively moves for summary judgment under Fed. R. Civ. 56(c), the Court notes that the issue of subject matter jurisdiction may properly be decided under Fed.R.Civ.P. 12(b)(1). *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.1988). In addressing this issue, the Court is not limited to the face of the pleadings but may consider evidence outside the complaint and resolve factual issues that go to the issue of the court's subject matter jurisdiction. *Id.*

Whether the government in fact abused its discretion or was negligent is not relevant to determining the applicability of the exception. *Id.* at 974; *Aragon,* 146 F.3d at 822.

### 1. *Whether the challenged conduct was discretionary*

■■■ As noted above, the government can not satisfy the first prong of the discretionary function test if there is a "federal statute, regulation, or policy in place that specifically prescribed a *particular course of action." Miller v. U.S.,* 163 F.3d 591, 594 (1998) (emphasis added); *Aragon,* 146 F.3d at 823–24 (finding that government regulations "prescribed a specific, mandatory course of conduct regarding the disposal of waste water from aircraft washdown operations at the Base"); *see also Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. If a particular course of action is prescribed then the government employee has no choice but to follow it and the discretionary function exception does not apply.

In this case, the regulations at issue fail to prescribe a *specific course of action* that the Corps failed to follow. Shea points to sections 20921(a) and 20937(a)(1) of Title 27 of the California Code of Regulations, which the Corps is required to comply with by way of federal regulations and policies. Section 20921(a), however, only sets a numeric standard—that is, it provides that methane gas migrating from the landfill "must not exceed 5% by volume in air at the facility property boundary ..."[2] A bare, numeric standard, however, is not a specific course of conduct.

In contrast, section 20937(a)(1) does prescribe a "course of action" in the event that the 5% standard is violated. The prescribed course of action, however, is not *specific.* Rather, this section states, in relevant part, that:

> When the results of gas monitoring indicate concentrations of methane in excess of the compliance levels required by § 20921(a), the operator shall:
>
> (1) Take all immediate steps necessary to protect public health and safety, and the environment.

Cal.Code Regs., tit. 27 § 20937(a)(1). On its face, this language fails to mandate a specific course of action. Instead, it calls for discretionary judgments as to the immediacy and nature of the risk—i.e. what, if any, "immediate" steps are "necessary" to "protect public health and safety, and the environment"—and, if so, judgments as to the substance and timing of those specific steps.

Shea also points to the Regional Water Board's Order 96–113 which mandates that the "treatment, discharge or storage of waste or materials shall not be allowed to create a condition of ... nuisance." Again, however, this language does not prescribe a specific course of action that must be followed. Rather, it is more in the nature of setting an objective or general standard that must be met without prescribing the particular actions government employee(s) must take to satisfy the standard, or in this case, avoid creating a nuisance. *See also Aragon,* 146 F.3d at 825.

Nor does Shea's reliance on *Starrett v. United States,* 847 F.2d 539 (9th Cir.1988), and *Clark v. United States,* 660 F.Supp. 1164 (W.D.Wash.1987), *aff'd,* 856 F.2d 1433 (9th Cir.1988), advance its cause. In *Starrett,* the Executive Order at issue required a specific course of action: the implemen-

---

**2.** Similarly, 40 C.F.R. § 257.3–8(a)(1)(2) just sets a numeric standard. Specifically, it provides that: "The concentration of explosive gases generated by the facility or practice shall not exceed: (1) Twenty–Five percent (25%) of the lower explosive limit for the gases in facility structures ...; and (2) The lower explosive limit for the gases at the property boundary."

tation of a "secondary treatment, or its equivalent, for all wastes except cooling water and fish hatchery effluents." *Id.* at 541. While there was a dispute as to whether the government had, in fact, undertaken a "secondary treatment," the directive calling for the secondary treatment was both mandatory and specific. In contrast, here, the far more general directive to take all immediate steps necessary to protect health and the environment—or to prevent a nuisance—does not involve an equally delineated course of conduct. Nor does *Clark* assist Plaintiff. As courts have observed, *Clark* was decided prior to *Berkovitz*, and its analysis "strays significantly from presently accepted discretionary function analysis." *Aragon*, 146 F.3d at 823, n. 4; *see also OSI, Inc. v. United States*, 285 F.3d 947, 952 (11th Cir.2002) (same).

In short, the governing regulations in this case do not prescribe a specific course of action but rather demand the exercise of judgment and discretion. As such, the Court turns to the second tier of the analysis to determine whether the discretionary actions taken are of the type that are susceptible to policy considerations. *Miller*, 163 F.3d at 594 ("The decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis").

### 2. Whether actions taken are susceptible to policy considerations

█ Here, the Corps has been required to exercise its discretion with respect to how to evaluate threats to public health and the environment and how to best address those threats. These kinds of judgments implicate policy choices and decisions of the type that Congress intended to protect from judicial second guessing. *See e.g. Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1541 (10th Cir.1992) (translation of health and safety provisions that require measures "necessary to prevent, minimize or mitigate damage to the public health" into concrete plans involves policy choices protected by the discretionary function exception); *Lockett v. United States*, 938 F.2d 630, 638–39 (6th Cir.1991) (EPA's discretion to determine response to evidence of PCB spill involved judgment calls protected by discretionary function exception); *United States Fidelity & Guaranty Co. v. United States*, 837 F.2d 116, 122–23 (3d Cir.1988) (execution of CERCLA program to protect public from dangers of abandoned toxic waste involves protected policy judgments).

Plaintiff cites to cases that involve matters relating to minor or routine maintenance. *See Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (involving failure to maintain a light in a lighthouse); *Gotha v. United States*, 115 F.3d 176 (3rd Cir.1997) (involving failure to provide a handrail and light on one 20 foot footpath to a trailer). Such cases do not implicate the same kinds of policy judgments that arise when evaluating and responding to public health and environmental hazards.

While neither party cites to a case exactly on point, the Court concludes that this case is more akin to cases such as *Daigle, Lockett,* and *Fidelity,* that involve environmental clean up directives than to cases involving minor housekeeping maintenance.[3] The Court's conclusion is also con-

---

**3.** Cases involving very narrow technical issues, as opposed to mandates to protect the public health and safety of the environment, are similarly distinguishable. *See e.g. Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir.1989) (involving single, objective question of proper amount of dyna-

mite to use for particular task); *Ayala v. United States*, 980 F.2d 1342 (10th Cir.1992) (involving narrow objective of issue of how to configure wiring of add-on lights for particular project). Notably, Plaintiff is not challenging some technical aspect of the remedy

sistent with the presumption that "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion ... the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267; *Western Greenhouses v. United States*, 878 F.Supp. 917, 928 (N.D.Tex.1995).

Plaintiff also emphasizes that the Court should give great weight to the fact that the government in this case is not acting in a core government capacity or making decisions unique to the agency's core mission, but rather is performing ordinary activities that commercial landfill owners perform every day. In such cases, Plaintiff argues, the government can not satisfy the second prong of the discretionary function test. For support, Plaintiff cites to *Redland Soccer Club, Inc. v. Dep't. of the Army*, 835 F.Supp. 803 (M.D.Pa.1993). Subsequent decisions have concluded, however, and this Court agrees, that *Redland's* limited view of the discretionary function exception is at odds with *Gaubert's* holding that the discretionary function exception protects all governmental discretionary decisions that are susceptible to policy analysis and not just decisions made by high level policy makers or decisions that go to the core of the agency's mission. *See e.g. Ara-*

*gon v. United States*, 950 F.Supp. 321, 326–27 (D.N.M. 1996); *Western Greenhouses*, 878 F.Supp. at 928–29 (*Redland* is inconsistent with *Gaubert* and the assumptions underlying the discretionary function doctrine); *see also Childers v. United States*, 40 F.3d 973, 974 n. 1 (9th Cir.1995) (discretionary function exception applies not just to high-level government employees but also to "low-level employees making discretionary day-to-day management decisions based on policy considerations.").[4]

In sum, the Court concludes that the government has satisfied its burden of demonstrating that Plaintiff's fifth through tenth causes of action, alleging state law tort claims, fall within the discretionary function exception to the Federal Tort Claims Act. As such, the Court lacks jurisdiction over such claims and they must be dismissed. *Berkovitz*, 486 U.S. at 535–36, 108 S.Ct. 1954.[5]

## II. CERCLA SECTION 113(h)

As discussed earlier, Defendant also argues that section 113(h) of CERCLA deprives this Court of subject matter jurisdiction over Plaintiff's fifth through tenth state law tort claims, as well as Plaintiff's fourth claim for relief under RCRA. The Court's ruling above renders this aspect of Defendant's motion moot

---

selected—eg., the design of the vent trench; rather, it is challenging the more policy oriented issue of how quickly certain remedies needed to be implemented to protect public safety.

4. Plaintiff also contends that the Corps can not invoke the discretionary function exception based on budgetary considerations because the regulation at issue here does not expressly permit the government to balance cost against other considerations. As the court stated in *National Union Fire Insur. v. United States*, 115 F.3d 1415, 1422 (9th Cir. 1997), when a statute requires a particular action, the government has no discretion to

spend its money doing something else instead. This is not a case, however, where the government failed to take a mandated action because of cost. Rather, in this case the Corps was required to decide what immediate steps were necessary to protect public safety and the environment, and it concluded, based on its assessment of the immediacy of the risks, or lack thereof, that a certain schedule was appropriate. *See* Hedgpeth Decl., Ex. HH at 3930–3933; Def.'s Ex. 19 at ¶¶ 6–21.

5. Given this conclusion, the Court does not reach Defendant's alternative argument that Shea's tort claims fall within the misrepresentation exception to the FTCA.

with respect to the state law tort claims. The Court considers this argument, however, with respect to Plaintiff's RCRA claim.

In 1986, Congress amended CERCLA to add section 113(h) which bars federal courts from exercising jurisdiction over "any challenges" to removal or remedial environmental response actions taken pursuant to section 9604 of CERCLA, 46 U.S.C. § 104, while those response action are ongoing—except for five exceptions not applicable here. *McClellan Ecological Seepage Situation ("MESS") v. Perry*, 47 F.3d 325, 330 (9th Cir.1995). Specifically, § 113(h) provides as follow:

(h) Timing of Review.

No federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) *to review any challenges to removal or remedial action selected under section 9604 of this title,* or to review any order issued under section 9606(a) of this title, in any action except one of the following . . .

46 U.S.C. § 9613(h) (emphasis added). In short, § 113(h) amounts to a "clear and unequivocal . . .'blunt withdrawal of federal jurisdiction'" with respect to any challenges to clean ups conducted under the authority of section 104 of CERCLA, 42 U.S.C. § 9604. *MESS*, 47 F.3d at 328.

As a threshold issue, the parties dispute whether the clean up in this action is proceeding under the authority of section 104. While the government contends that it is, Plaintiff argues that the clean up is being undertaken pursuant to the authority of section 120 of CERCLA, 46 U.S.C. § 9620, and thus is properly categorized as a § 120 clean up. Section 120 contains provisions applicable to clean ups on federal facilities,

such as the former Hamilton Air Force base.

The issue is significant because the Ninth Circuit held, in *Fort Ord Toxics Project, Inc. v. California E.P.A.,* 189 F.3d 828 (9th Cir.1999), that when a clean up is conducted pursuant to the authority of § 120, the jurisdictional bar in section 113(h) only applies to removal, and not remedial actions—and it is Plaintiff's position that the response actions at issue in this case are remedial actions. Plaintiff concludes, therefore, that under *Fort Ord,* the jurisdictional bar set forth in section 113(h) is inapplicable to this case.

This Court concludes, however, that this case does not fall within the facts or rationale of *Fort Ord.* In *Fort Ord,* the Court found that "§ 120 created a grant of authority separate from § 104." 189 F.3d at 833. In so finding, the Court relied on those provisions of § 120 that vest authority in the Administrator of EPA to undertake remedial actions. Thus, the Court cites to § 9620(e)(2), which grants *the Administrator of the EPA* the "authority to conduct remedial actions on federal property," and § 9620(g) which provides that "'[No] authority vested in *the Administrator* under this section may be transferred, by executive order of the President or otherwise, to any other officer . . . or person." 189 F.3d at 833–34 (emphasis added). The Court also notes that other provisions of CERCLA that address *remedial* actions distinguish between § 104 and § 120. *See e.g.* 42 U.S.C. § 9613(g) (". . . if the President is diligently proceeding with a remedial investigation . . . under section 104(b) or section 120"); *id.* at 833. Other provisions in § 120 also address *the Administrator's* authority with respect to remedial clean ups at federal cites. *See e.g.* 42 U.S.C. § 9620(e)—(f).

In light of § 120's separate grant of authority to EPA to conduct remedial ac-

tions on federal facilities, *Fort Ord* concludes that claims challenging such actions are not barred by section 113(h)—which applies only to clean ups authorized by § 104. It further notes, however, that section 120 does not also grant the Administrator authority to conduct *removal* actions. *Id.* at 834. Thus *Fort Ord* also holds that removal actions on federal property still fall under the general ambit of § 104, and thus are protected by the jurisdictional bar of section 113(h). *Id.*

Importantly, it was undisputed in *Fort Ord* that the clean up at issue was a remedial action being conducted by EPA pursuant to the grant of authority created by § 120. *Fort Ord,* 189 F.3d at 834. The site at Fort Ord was placed by the EPA on its National Priorities List and the clean up was being conducted pursuant to EPA's delegated authority through an interagency agency agreement between the EPA, the Army, and California state agencies. *Fort Ord,* 189 F.3d at 830. Indeed, the EPA administrator has been delegated much of the authority for administering CERCLA. *See* U.S.C. § 9615; Exec. Order 12580, 52 Fed.Reg. 2923, 2924 (Jan. 23, 1987).

In this case, however, the site at issue is not included on the National Priorities List and the EPA is not involved. As a result, authority to undertake the clean up has been delegated to the Secretary of Defense. *See* Section 104 of CERCLA, 42 U.S.C. § 9604 (authorizing the President to act in response to releases of hazardous wastes); Exec. Order 12580 at § 2(e) (delegating authority under § 104

to the Department of Defense with respect to contamination on Defense Department facilities); *see also* Def.'s Ex. 21 at 2.

Thus the rationale underlying the holding in *Fort Ord*—the creation of a separate authority in § 120 for the Administrator to conduct remedial actions at federal facilities—is simply not applicable here. *Fort Ord,* of course, did not have occasion to address the relationship between § 120 and § 113(h) in cases, such as this, where the clean up is not being conducted pursuant to the Administrator's authority. Given however, that *Fort Ord* carved out an exception to the general jurisdictional bar in § 113(h), the Court is not persuaded that is appropriate to extend *Fort Ord* beyond the clear rationale and facts of that case. As such, it rejects Plaintiff's contention that this case is governed by *Fort Ord,* and concludes that the response actions in this case were authorized by § 104 and thus are governed by § 113(h).[6]

Given the above, the Court now turns to the effect of § 113(h) on Plaintiff's fourth claim for injunctive relief under RCRA. As noted above, § 113(h) serves as a jurisdictional bar to "any challenges" to an ongoing CERCLA clean up. Defendant asserts that Plaintiff's fourth claim for relief under RCRA constitutes such a challenge while Plaintiff asserts that it does not. In particular, Plaintiff argues that it is not seeking to delay or obstruct the chosen remedy; rather, it simply seeks to enforce governing state laws, regulations, and orders.

---

**6.** This is not to say that § 120 has no bearing on federal facilities that are not listed on the NPL. For example, § 120(a)(4) provides that a federal agency conducting removal or remedial actions at a facility not listed on the NPL must comply with applicable State laws. Such a provision, however, does not create a separate source of clean up authority.

Plaintiff also argues that Defendant's post–1999 work was conducted pursuant to orders issued by the RWQCB, rather than § 104 of CERCLA, and therefore Plaintiff is not subject to the restrictions in § 113(h). While the Corps incorporated state requirements into its response action, Plaintiff's attempt to entirely erase the underlying § 104 authority from this action is not persuasive.

**1204**

In *McClellan*, however, the Ninth Circuit took a broad view of the scope of § 113(h). There, the plaintiffs made an argument similar to that advanced here: that their RCRA claim was not a "challenge" under § 113(h) because it was not attempting to delay or obstruct the remedy, but rather was only seeking to compel the defendant's compliance with RCRA's requirements. 47 F.3d at 330–31. The Court held that while tangentially related claims, such as those to enforce minimum wage requirements, would not constitute a challenge under § 113(h), that the plaintiffs' claim was "far more directly related to the goals of the cleanup itself." *Id.* at 330. The Court also concluded that for "all practical purposes" the plaintiffs were effectively seeking to "improve" the clean up. *Id.* As such, it found that the plaintiff's claim was a "challenge" barred by § 113(h). *Id.*

Here, Shea also argues that it is merely seeking to enforce Defendant's compliance with applicable state laws and requirements. *See* Pl.'s Opp. at 30. It is apparent, however, that it has a different view of what state law requires than does Defendant; otherwise it would have no purpose in seeking injunctive relief. Indeed, Plaintiff alleges that the Corps' response has not adequately contained or controlled the migration of landfill gas and that it should be "enjoined to abate the migration." *See* Compl. ¶¶ 72–75. Plaintiff also contends, as noted above, that the Corps has made improper choices with respect to the timing of certain elements of the remedy. As such, the Court concludes that Plaintiff effectively seeks injunctive relief to "im-

prove" the on-going clean up. As such, Plaintiff's RCRA claim is plainly related to the goals of the clean up—and would likely require some interference with on-going clean up plans. Accordingly, the RCRA claim constitutes a "challenge" for purposes of § 113(h), and must therefore be dismissed for lack of jurisdiction. *See also Hanford Downwinders Coalition, Inc. v. Dowdle,* 71 F.3d 1469, 1482 (9th Cir.1995) ("We held in *Razore v. Tulalip Tribes,* 66 F.3d 236 (9th Cir.1995) that '[a]n action constitutes a challenge if it is related to the goals of the cleanup' ").[7]

Plaintiff nonetheless urges the Court to allow its RCRA claim to proceed, citing *United States v. Colorado,* 990 F.2d 1565 (10th Cir.1993), for the proposition that an action to enforce state law is not a challenge under § 113(h). To the extent that *Colorado* is inconsistent with Ninth Circuit precedent, it is not persuasive. More fundamentally, however, *Colorado* is clearly distinguishable in that the Court premised its ruling on the fact that the party asserting the RCRA claim was a state, rather than a private party. *Id.* at 1576 ("In light of § § 9652(d) and 9614(a) [of CERCLA], which expressly preserve *a state's authority to take such action,* we cannot say that Colorado's efforts to enforce its EPA-delegated authority is a challenge to the Army's undergoing CERCLA response action") (emphasis added). Accordingly, this Court is not inclined to find that *Colorado* justifies permitting Shea's RCRA claim in this case.

*CONCLUSION*

For all of the reasons set forth above, this Court concludes that:

---

7. Courts in other circuits have also emphasized the broad sweep of § 113(h). *See e.g. North Penn Water Authority v. Bae Systems, Inc.,* 2005 WL 1715718, *9 (E.D.Pa.) ("Although in enacting § 113(h) Congress may have been primarily concerned with preventing ... delay[] or obstruct[ion] ... federal courts have held that, other than the five enumerated exceptions, § 113(h) 'effectuates a 'blunt withdrawal of federal jurisdiction,' despite its more limited rationale.' ") (citations omitted); *Oil, Chemical & Atomic Workers Int'l Union v. Pena,* 62 F.Supp.2d 1, 12 (D.D.C.1999)("Section 113(h) is very clear, however, that courts are not to interfere with ongoing cleanup actions").

1. Defendant's Motion to Dismiss Plaintiff's Fourth through Tenth Claims for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) is granted.

2. Plaintiff's Fourth Claim is dismissed for lack of subject matter jurisdiction pursuant to § 113(h) of CERCLA.

3. Plaintiff's Fifth through Tenth Claims are dismissed for lack of subject matter jurisdiction on the ground that United States has not waived its sovereign immunity with respect to these claims under FTCA.

**IT IS SO ORDERED.**